64 F.3d 656
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Marion I. CHEATHAM, Plaintiff-Appellant,
v.
FORD MOTOR COMPANY, a Delaware Corporation; Matt Dillon,
District Sales Manager; Leo Cumbelich, District Sales
Manager; Joe King, District Sales Manager; Leo Warner,
Regional Sales Manager; Phillip Benton, President and Chief
Operating Officer of Ford Motor Company; Harold A. Poling,
Chairman and C.E.O. of Ford Motor Company, Defendants-Appellees.
 No. 94-2648.
 United States Court of Appeals, Fourth Circuit.
 Argued June 8, 1995.
Decided Aug. 14, 1995.
 
 ARGUED: Jesse Matthewson Baker, Tarboro, NC, for Appellant. Douglas Wayne Kenyon, HUNTON & WILLIAMS, Raleigh, NC, for Appellee. ON BRIEF: A. Todd Brown, HUNTON & WILLIAMS, Raleigh, NC; David F. Peters, HUNTON & WILLIAMS, Richmond, VA, for Appellee.
 Before HALL and MOTZ, Circuit Judges, and JACKSON, United States District Judge for the Eastern District of Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Marion Cheatham appeals the district court's order granting summary judgment to Ford Motor Company on her breach of contract, fraud, and related claims. Cheatham sued Ford after participating in Ford's Minority Dealership Program.
 
 
 2
 Cheatham also appeals several nondispositive pretrial orders. Finding no error, we affirm.
 
 I.
 
 3
 In 1985, Marion Cheatham, a sales manager in the midtown Manhattan office of the Eastman-Kodak Company, began looking for opportunities to start her own business. In September 1986, Cheatham wrote a letter to Ford Motor Company expressing interest in obtaining a dealership. Ford sent her several applications and the address of the appropriate person to contact.
 
 
 4
 In February 1987, Cheatham met with Vera Weiss, a Ford training coordinator. According to Cheatham, Weiss told her that Ford's Minority Dealership Program was a wonderful opportunity for success and that it was superior to the minority dealer programs of Gen eral Motors and Chrysler. Weiss also explained that applicants to the program needed a district sponsor and that once accepted, trainees received a monthly stipend of $3,200.
 
 
 5
 Cheatham decided she could not live in New York on the trainee stipend and applied to Ford officials in her home-state of North Carolina for sponsorship. On June 12, 1987, she sent an application to Matt Dillon, Ford's District Sales Manager in Charlotte, North Carolina. She met with Dillon in July, and in December 1987 Ford chose her to participate in the Ford Minority Dealership Program.
 
 
 6
 Cheatham began her training in January 1988 at a Ford dealership in Gastonia, North Carolina. Her supervisors considered her an excellent student and Ford began looking for a dealership for her to invest in after she completed the program.
 
 
 7
 During the following months, Cheatham and Ford had difficulty agreeing on a dealership. Cheatham wanted to acquire a medium to large dealership in a large metropolitan area, but Ford only offered her small-town dealerships. When Ford offered her a small dealership in Moultrie, Georgia, she was reluctant to accept the offer. Nevertheless, Cheatham decided to invest in Moultrie Ford, and for that purpose she entered into a partnership with another dealer candidate named Norman Lovein.
 
 
 8
 Cheatham claims she reached this decision because Ford made a "side agreement" with her. According to Cheatham, a Ford representative named Cornelius Willingham told her that if she managed the Moultrie dealership successfully for "12 to 18 or 24 months," she would get a large metropolitan dealership. J.A. at 482. She also claims that as part of this agreement, Ford required her to accept Lovein as her business partner. J.A. at 475A.
 
 
 9
 Cheatham completed Ford's Minority Dealership Program in December 1989, and on December 7, 1989 she and Lovein entered into a dealership agreement with Ford. The agreement provided that the Moultrie dealership would be capitalized with a Ford investment of $625,000, that it would be "wholly-owned" by Ford for six months, and that during the six-month period Cheatham and Lovein would serve as Ford's "Hired General Managers." In addition, the agreement required Cheatham and Lovein to deposit $125,000 in an escrow account pledged to purchase the dealership's common stock at the end of the "wholly-owned" period. Cheatham contributed approximately $73,760 to the escrow account.
 
 
 10
 Ford included in the agreement its projection that the Moultrie dealership would lose at least $54,200 during the "wholly-owned" period. Although Ford would not guarantee actual losses would not exceed those projected, the company stipulated that it would cover any losses incurred during its ownership. Ford also promised to return the escrowed money with interest if it canceled the dealership agreement.
 
 
 11
 Cheatham operated Moultrie Ford as a general manager for the next 21 months. The dealership lost $374,000 over this period, including the $54,200 in projected losses. Ford covered the entire amount. Cheatham resigned as a general manager of Moultrie on August 12, 1991, and Ford returned her escrow investment with interest.
 
 
 12
 Cheatham sued Ford and several company officials in North Carolina Superior Court on September 29, 1992. Her complaint alleged breach of contract, fraud, unfair and deceptive trade practices, breach of fiduciary duty, and racial discrimination. On October 30, 1992, Ford removed the suit to the United States District Court for the Eastern District of North Carolina based on diversity and federal question jurisdiction. On May 16, 1994, Ford moved for summary judgment.
 
 
 13
 On October 12, 1994, after two years of discovery and related motions, the magistrate entered a Memorandum and Recommendation ("M & R") concluding that Ford was entitled to summary judgment on all of Cheatham's claims. The district court reviewed the M & R, and finding its conclusions in accordance with the law, granted Ford's motion for summary judgment. This appeal followed.
 
 II.
 
 14
 Cheatham's primary argument is that the district court improperly granted summary judgment to Ford on all of her claims. Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We review a district court's grant of summary judgment de novo. See Cohn v. Bond, 953 F.2d 154, 157 (4th Cir.1991).
 
 A.
 
 15
 Cheatham claims Ford promised that if she managed the Moultrie dealership successfully she would obtain a larger dealership. She points to an October 31, 1989 letter from Ford Sales Manager J.L. King as evidence of this promise and asserts that it is a written contract. We disagree.
 
 The King letter states:
 
 16
 The Atlanta District Sales office is fully committed to developing opportunities for qualified minorities in viable points within our district boundries [sic]. The point you are being offered in Moultrie, GA is consistent with that philosophy. Our policy has been and will be in the future to select candidates for larger points within our district based on actual in-dealership experience. We believe the experience you draw as operator of Moultrie Ford Lincoln-Mercury will put you at or near the top of our list of candidates. If your investment in Moultrie, [sic] proves successful we anticipate offering you an opportunity for a larger point in the future.
 
 
 17
 J.A. at 406.
 
 
 18
 The essential elements of a contract are an offer and an acceptance. See Yeager v. Dobbins, 114 S.E.2d 820, 823 (N.C.1960). In order for parties to enter into a contract, "[t]he offer must be communicated, must be complete, and must be accepted in its exact terms." Id. at 824. Furthermore, material terms must be definite. " 'If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement.' " Boyce v. McMahan, 208 S.E.2d 692, 695 (N.C.1974) (citation omitted).
 
 
 19
 The King letter is not a contract. At most, it is a statement of what Ford hoped to do at some point in the future. Moreover, even assuming the letter to be an offer, the terms are incomplete. There is no mention of how long Cheatham would have to remain at Moultrie or how Ford would measure her success. "The courts generally hold a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness." Id.
 
 
 20
 Cheatham also makes the argument that Cornelius Willingham's statement that she would have to remain in Moultrie for "12 to 18 or 24 months" is parol evidence that, because of her allegations of fraud, would support her claim of a contract with Ford. However, her deposition shows that she was aware Ford officials did not intend to commit to a timetable for moving her to a larger dealership.
 
 
 21
 Cheatham testified that the letter was "not satisfactory" to her because King would not include language stating how long she would have to stay at Moultrie and that profit was not to be considered in measuring her success. J.A. at 482. Under North Carolina law, "[t]o constitute a valid contract, the parties 'must assent to the same thing in the same sense, and their minds must meet as to all the terms.' " Boyce, 208 S.E.2d at 695 (citation omitted). In this case, the parties were not agreeing to the same thing in the same sense. Therefore, there was no valid contract between them.
 
 B.
 
 22
 Cheatham makes two fraud claims against Ford. She alleges that Ford never intended to give her the opportunity to invest in a viable dealership and that Ford attempted to sell her the Moultrie dealership by using false sales data.[1] A plaintiff seeking to prove fraud must show:
 
 
 23
 (1) that the defendant made a representation of a material past or present fact; (2) that the representation was false; (3) that it was made by the defendant with knowledge that it was false or made recklessly without regard to its truth; (4) that the defendant intended that the plaintiff rely on the representation; (5) that the plaintiff did reasonably rely on it; and (6) injury.
 
 
 24
 Braun v. Glade Valley School, Inc., 334 S.E.2d 404, 407 (N.C.1985) (citations omitted). Cheatham cannot satisfy this standard.
 
 
 25
 We find that the alleged promise that Cheatham would obtain a viable dealership was not a representation of a material past or present fact. Instead, it addressed possible actions by Ford in the future. In addition, Cheatham suffered no injury. According to her deposition, Ford returned her escrow investment with interest. J.A. at 476 & 501A.
 
 
 26
 As for her allegation that Ford provided false sales data, the record shows that Ford advised Cheatham not to rely on its representations but to conduct her own research. For example, Cheatham signed a Sales and Service Agreement with Ford dated October 30, 1989. It stated:
 
 
 27
 Operation of a retail automobile dealership involves an element of risk. Success depends on management abilities of the operator, industry conditions and the local economy. None of these factors is within the control of Ford Motor Company and it, therefore, cannot predict the success of the proposed dealership. Thus, in entering into [this agreement] with Ford Motor Company, we would not want you to rely on representations Ford may have made, or information Ford has provided, or failed to provide. You should rely solely on your own experience, investigation, analysis and judgment.
 
 
 28
 J.A. at 404. Similarly, the dealership agreement that Cheatham signed on December 7, 1989 states:
 
 
 29
 The Atlanta District Sales Office has developed and reviewed with Operator a sales and profit forecast which projects an operating loss in the amount of $54,200.00 during the wholly-owned period. Ford provides no assurance whatsoever that the actual losses incurred during the wholly-owned period will not exceed the amount set forth in the preceding sentence.
 
 
 30
 J.A. at 408. In view of these documents, Cheatham's fraud claims are without merit.
 
 C.
 
 31
 Cheatham next alleges that Ford's "misrepresentations" constituted unfair and deceptive trade practices and violated N.C. GEN. STAT. Sec. 75-1.1.[2] This claim is meritless for two reasons.
 
 
 32
 First, N.C. GEN. STAT. Sec. 75-1.1 does not apply to employer-employee relationships. See Buie v. Daniel International Corp., 289 S.E.2d 118, 119-20 (1982). We find that as a Ford "Hired General Manager" Cheatham was an employee of the company.
 
 
 33
 Second, Cheatham's unfair trade claim stems entirely from Ford's alleged guarantee to give her a viable dealership. J.A. at 14-17.[3] Under North Carolina law, "a mere breach of contract, even if intentional, is not sufficiently unfair and deceptive to sustain an action under N.C.G.S. Sec. 75-1.1." Branch Banking & Trust Co. v. Thompson, 418 S.E.2d 694, 700 (N.C.1992).
 
 D.
 
 34
 Cheatham makes the argument that Ford breached a fiduciary duty to her. No such duty existed. "[P]arties to a contract do not thereby become each other's fiduciaries; they generally owe no special duty to one another beyond the terms of the contract...." Branch, 418 S.E.2d at 699.
 
 E.
 
 35
 Cheatham also claims that Ford interfered with her civil rights in violation of Chapter 99D-1 of the North Carolina General Statutes. The plain language of the statute says that "No civil action may be brought or maintained, and no liability imposed, under this Chapter against ... an employer or his agent with respect to actions taken concerning his employees within the scope of the employment relationship." N.C. GEN. STAT. 99D-1 (c) (1992). Therefore, Cheatham's discrimination claim cannot be sustained.
 
 III.
 
 36
 Finally, we address Cheatham's appeal of certain pretrial rulings. Cheatham argues that the following magistrates' orders were clearly erroneous: the January 3, 1994 order setting discovery deadlines; the June 17, 1994 order partially denying her March 2, 1994 motion to compel; the August 3, 1994 order denying her request to delay ruling on Ford's summary judgment motion; and the September 27, 1994 order denying her motion to extend discovery and striking certain documents from the record.
 
 
 37
 A party seeking to object to a magistrate's ruling on a nondispositive matter must appeal the ruling to the district court within ten days after service. See FED. R. CIV. P. 72(a). Once this period has expired, "a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made." Id.
 
 
 38
 Cheatham did not timely appeal the magistrates' orders to the district court. Therefore, she has waived review of these orders. See Pagano v. Frank, 983 F.2d 343, 346 (1st Cir.1993) (stating: "when ... a litigant could have tested a magistrate's ruling by bringing it before the district judge, but failed to do so within the allotted ten-day period, he cannot later leapfrog the trial court and appeal the ruling directly to the court of appeals.").
 
 IV.
 
 39
 For the foregoing reasons, we affirm the district court's decision.
 
 
 40
 AFFIRMED.
 
 
 
 [1]
 Cheatham also argues that Ford fraudulently failed to inform her of its minority program failure rate. Because she did not raise this issue before the district court we will not address it on appeal. See Fowler v. Land Management Groupe, Inc., 978 F.2d 158, 164 (4th Cir.1992); National Wildlife Federation v. Hanson, 859 F.2d 313, 318 (4th Cir.1988)
 
 
 [2]
 Subsection (a) of this provision states: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."
 
 
 [3]
 Cheatham makes the additional argument before this Court that Ford committed an unfair trading practice by concealing the failure rate of minority dealerships. Again, she did not raise the issue before the district court, therefore, it has been waived