**VOLUMETRICS MEDICAL IMAGING, INC., Plaintiff,**

v.

**ATL ULTRASOUND, INC., Defendant.**

No. 1:01–CV–182.

United States District Court, M.D. North Carolina.

Jan. 29, 2003.

Michael S. Connor, Alston & Bird, LLP, Charlotte, NC, Michael P. Kenny, Angela Payne James, Alston & Bird, Atlanta, GA, Mark C. Hansen, Kevin B. Huff, Eduardo M. Penalver, Kellogg Huber Hansen Todd & Evans, P.L.L.C., Washington, DC, for Volumetrics Medical Imaging, Inc.

John L. Sarratt, Amie Flowers Carmack, Ann M. Anderson, Kennedy Covington Lobdell & Hickman, L.L.P., Raleigh, NC, for ATL Ultrasound, Inc.

*MEMORANDUM OPINION*

BEATY, District Judge.

## I. INTRODUCTION

This matter comes before the Court on Defendant ATL Ultrasound Inc.'s ("De-

fendant" or "ATL") Motion for Summary Judgment [Document # 47]. Also before the Court are Defendant's Motion to Strike [Document # 57] portions of declarations filed by Plaintiff Volumetrics Medical Inc. ("Plaintiff" or "VMI") accompanying its memorandum in opposition to Defendant's Motion for Summary Judgment, and Defendant's Motion to Strike [Document # 58] Plaintiff's Statement of Specific Facts. For reasons explained herein, Defendant's Motion for Summary Judgment shall be GRANTED in part and DENIED in part. Defendant's Motion to Strike portions of Plaintiff's declarations shall be DENIED, and Defendant's Motion to Strike Plaintiff's Statement of Specific Facts shall be GRANTED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant is a Washington corporation with its principal place of business also in Washington State. (Complaint ¶ 8.) Defendant's ultimate corporate parent is Royal Philips Electronics ("Philips"). (Compl., ¶¶ 8, 2.) Plaintiff is a Delaware corporation with its principal place of business in Durham, North Carolina. (Compl., ¶ 7.) Plaintiff alleges damages in an amount exceeding $75,000, to be more fully determined at trial. (Compl., ¶¶ 60, 68, 74, 79, 86, 91.) Hence, this Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

Plaintiff is a start-up company founded in 1991 by two researchers at Duke University, Olaf Von Ramm and Steve Smith, and by John Oxaal, a venture capital investor and former student of Dr. Von Ramm. (Brief in Sup. of Def.'s Mot. for Sum. Judg., at 1.) Plaintiff's corporate focus was developing the commercial applications of certain innovative medical technologies, including ultrasound diagnostic imaging machines capable of displaying images of the human body, in real time, in both two and three dimensions ("RT2D" and "RT3D"). (Compl., ¶ 1.) Plaintiff operated under government grants until 1995 when it began to obtain venture capital. (Brief in Sup. of Def.'s Mot. for Sum. Judg., at 1–2.) In addition to Mr. Oxaal, two of Plaintiff's principal investors were Bill Bright and Walter Wilkinson. (Id. at 2.)

In the fall of 1999 Plaintiff appointed Bright to locate a strategic partner to help take a RT3D ultrasound machine to market. (Id.) Upon invitation from Plaintiff, Defendant's Chief Technical Officer, Jacques Souquet, visited Plaintiff's demonstration of its ultrasound technology at the 1999 American Heart Association trade show. (Id.) Shortly thereafter Mr. Souquet appointed David Croniser ("Croniser"), director of cardiology product development, to learn more about Plaintiff. (Id.) At the beginning of this learning process Plaintiff and Defendant signed a Mutual Nondisclosure Agreement to protect the confidentiality of any proprietary information they might share. (Dep.Exh. 396.)

Through the early months of 2000, representatives from Plaintiff and Defendant met on three occasions. In January 2000, Plaintiff gave a presentation about its 3D technology to Croniser and two of Defendant's senior engineers, Roy Peterson and David Roundhill. (Compl., ¶ 17; Brief in Sup. of Def.'s Mot. for Sum. Judg., at 2.) On February 28 and 29, 2000, Plaintiff's engineers and Defendant's engineers had a detailed discussion about a potential joint machine that would utilize technology from both companies. (Compl., ¶ 20–21; Brief in Sup. of Def.'s Mot. for Sum. Judg., at 2.) At the same time, Croniser met with Plaintiff's business representatives to discuss a preliminary structure of a potential business deal between ATL and VMI. (Compl., ¶ 22; Brief in Sup. of Def.'s Mot. for Sum. Judg., at 2.) In March 2000, three of Plain-

tiff's representatives demonstrated Plaintiff's 3D technology at Defendant's headquarters in Bothell, Washington to some of Defendant's engineers and to various members of Defendant's management, including CEO Tim Mickelson. (Compl., ¶ 26; Brief in Sup. of Def.'s Mot. for Sum. Judg., at 2.)

At a meeting in Durham, N.C. on April 13 and 14, 2000, Croniser and three of Plaintiff's investors -Bright, Oxaal, and Wilkinsonmet to further discuss a potential deal involving a possible joint venture and/or corporate purchase of VMI by ATL. (Compl., ¶ 28.) The group ultimately generated a document entitled "ATL/Volumetrics Term Sheet April 14, 2000 Rev. 1.01" ("Term Sheet"). (Compl., ¶ 28; Dep. Exh. 486.) Plaintiff points to this document as an indication of an alleged agreement between Plaintiff and Defendant. (Compl., ¶¶ 28–29.) This document, however, was not signed by either party.

Croniser, Peterson, and one of Defendant's financial analysts presented the idea for a potential VMI/ATL joint project to their superiors during a meeting of Defendant's management council on June 16, 2000. (Brief in Sup. of Def.'s Mot. for Sum. Judg., at 4.) In the days following the meeting at ATL Croniser described the meeting's substance in voicemails to Jim Mundell, Plaintiff's Vice President and General Manager, and to Steve Grenon, Plaintiff's Vice President and Chief Technical Officer. (*Id.*) Each of Croniser's voicemails also discusses Philips, Defendant's corporate parent, stating in one of the messages that "we have at least gotten over the first hurdle, the ATL hurdle and now we have two Phillips [sic] hurdles to go through. One is the Michelson's [sic] Group and the second one is the whole Board of Directors for Philips corporate." (Dep.Exh. 458.) Similar references to Philips appear in the other voicemails. (*See* Dep. Exh. 458; Dep. Exh. 491.)

Mundell and Grenon had the text of the voicemails transcribed and provided them to Bright. (*Id.*) In turn, Bright sent an email to Plaintiff's other principal investors and to three of Plaintiff's directors informing them of Croniser's reports. (Dep.Exh. 488.) Thereafter, Plaintiff alleges it committed its engineers and other employees to using 100% of their time to work on a joint VMI–ATL ultrasound machine. (Compl., ¶ 29.)

Around June 2000, Plaintiff provided Defendant with engineering resource and budget information, and Plaintiff and Defendant worked together to develop a joint budget. (Compl., ¶ 30c.) Throughout July 2000, Plaintiff's engineers and Defendant's engineers corresponded with each other with questions and information regarding the technical details of the potential machine. (*See* Grenon Decl., ¶¶ 35f–35s and citations contained therein.)

Croniser met again with Plaintiff's business representatives on July 7, 2000. Croniser informed them that the Philips Mergers and Acquisitions group had become preoccupied with negotiations for another potential deal, and that he did not know the nature of those negotiations. (Compl., ¶ 41; Brief in Sup. of Def.'s Mot. for Sum. Judg., at 5.) Croniser predicted this would cause a delay, which could span two or more months. (Compl., ¶ 41.)

On July 14, 2000, Roundhill and Peterson of ATL traveled to VMI for a joint engineering meeting and reviewed design plans for the joint product, product cost projections, and other development plans. (Compl., ¶ 31.) As a result of the meeting, Plaintiff and Defendant developed a list of action items, which assigned tasks for both parties to complete. (*Id.*) Jim Mundell of VMI emailed the list of action items to Defendant and, in his email cover letter, described the list as "a summary of the action items we generated in our meeting

last Friday" and, later in the email, informing ATL that he would "be more insistant [sic] as time goes on that we assign names, priority and dates to each item so that we can successfully drive our project and companies forward." (Dep.Exh. 61.)

Throughout July, August, and September of 2000, Croniser of ATL and Bright of VMI talked several times. Croniser also communicated with Plaintiff's Vice President and Chief Technical Officer Grenon. Croniser kept Plaintiff posted on the status of progress toward finalizing the joint transaction and was generally optimistic about "moving forward." (Compl., ¶¶ 42, 44–47; Dep. Exhs. 458, 491.) As a reason for the delay, Croniser stated that Mickelson, Defendant's CEO, was tied up with the other transaction, as were the mergers and acquisitions people at Philips. (Compl., ¶¶ 41, 47; see also Dep. Exh. 495.)

Croniser traveled to Durham, N.C. to meet with VMI again on September 18, 2000. (Compl., ¶ 48.) The purpose of this visit, as described in an email from VMI's Jim Mundell to the company's engineers, was to "assure us that ATL is still very interested in working with us . . . ." (Dep. Exh. 191.) Mundell also noted that "[t]here will be no negotiations occuring [sic] during this visit. As we have said before, no negotiations will take place until the Philips lawyers become available." (Id.) The meeting included a presentation by Croniser to all of VMI's employees. (Dep.Exh. 495.) Bill Bright of VMI generated notes from the meeting, which reflect that Bright's impression of "the outside [time frame Croniser was] look[ing] at was four weeks or maybe five weeks that we ought to have negotiated and gotten the final deal." (Id.) At the end of the day, Bright drove Croniser to the airport and the two of them discussed the potential deal further. Bright's notes also reflect this conversation, stating that "he [Cronis-

er] was telling me driving in the car how tough these M & A people were going to be." (Id.) Bright's notes conclude by stating that "I felt that he [Croniser] is being more pessimistic about what they can do with me than he was in front of the people." (Id.)

Croniser's employment with Defendant ended in late October 2000, for reasons upon which the parties have not elaborated. (Brief in Sup. of Def.'s Mot. for Sum. Judg., at 6.) Chief Engineer Roy Peterson thereafter became Plaintiff's main contact person at ATL. (Id.)

On November 17, 2000, Philips publicly announced that it had agreed to acquire a portion of a subsidiary of Hewlett Packard known as Agilent. (Dep.Exh. 194.) Specifically, Philips planned to acquire Agilent's Healthcare Solutions Group ("Agilent HSG" or "Agilent"). (Id.) However, due to the large size of the transaction the corporations had to gain the approval of the United States Department of Justice before the deal could be closed. (See e.g. Mickelson Dep., at 61–68, 259–60.) As it turned out, ultrasound was a part of Agilent HSG's range of products. (Brief in Sup. of Def.'s Mot. for Sum. Judg., at 6.) Defendant ATL, however, contends it did not know the details of Agilent HSG's 3D ultrasound technology until after the Department of Justice approved the acquisition in May 2001. (Id.)

On December 1, 2000, Bright, Grenon, and other VMI employees traveled to Washington State and met with various ATL employees, including CEO Mickelson, to discuss the status of the ATL/VMI talks in light of Philips' planned acquisition of Agilent. (Compl., ¶ 53, Dep.Exhs.499, 500.) Bright's notes on the meeting indicate that he and Grenon proposed exploring ways in which all three companies might work together. (Dep.Exhs.499, 500.) Bright also put forth a proposal requesting that, beginning in January

2001, Defendant buy $250,000 of Plaintiff's stock each month at a price of $3.50 per share. (Dep.Exh. 500.) During the meeting, Mickelson asked that Bright send this proposal to him in writing after Bright had returned to Durham, N.C. (*Id.*)

Bright sent a letter to Mickelson on December 5, 2000 setting forth the "short term" proposal as he had described it in the December 1, 2000 meeting. (Dep.Exh. 501.) The funding scheme Bright recommended in his proposal to Mickelson was to be in effect "until the Agilent transaction is approved or disapproved by the government. At that time, we [VMI] would then meet with you [Mickelson] and/or your team to finalize a deal that is fair to both of us." (*Id.*)

On January 5, 2001 Mickelson called Bright to state that ATL could not accept Bright's December 5, 2000 proposal. It was also at that time that Mickelson advised Bright that ATL would not further proceed with discussions with VMI. (Compl., ¶ 55, Dep.Exh. 502.) Subsequently, on February 16, 2001, Plaintiff ceased all its operations and terminated all but one of its employees. (Compl., ¶ 55, Grenon Decl., ¶ 2.) Plaintiff commenced this action on the same day asserting claims of breach of contract, breach of joint venture agreement, actual and constructive fraud, negligent misrepresentation, unfair and deceptive acts and practices and/or unfair competition, breach of fiduciary duty, and unjust enrichment. (Compl., ¶¶ 56–91.)

The Court will consider these claims in turn. However, Defendant has certain preliminary motions before the Court that will be addressed prior to considering the substantive issues raised by the summary judgment motion.

## III. DISCUSSION

### A. Motions to Strike

The Court will first consider Defendant's Motions to Strike, since they bear on what will comprise the record which the Court may look to in deciding the Motion for Summary Judgment.

### 1. Motion to Strike Portions of Declarations Submitted by Volumetrics

Defendant's first motion to strike [Document # 57] moves to strike portions of the Declarations which Plaintiff submitted as an attachment to its response to Defendant's Motion for Summary Judgment. As set forth in Federal Rule of Civil Procedure 56(e), such affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." As a basis for its Motion to Strike, Defendant points to Rule 56(g) which prohibits affidavits presented for the purpose of delay. Fed.R.Civ.P. 56. Defendant cites *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999), and argues that the Rule 56(g) concept "has been held to include affidavits filed inconsistent with deposition testimony where there is no explanation given for the change of position and where the apparent purpose is simply to attempt to create an issue of fact." (Mot. to Strike Portions of Decs. Submitted By Volumetrics, at 1.) In addition to the prohibition against conflicting testimony, Defendant notes that affidavits must be based on personal knowledge, rather than on information and belief, and must not amount to conclusory allegations or speculation. (*Id.* at 2.)

Within its motion, Defendant objects to numerous, specific portions of the declarations of William Bright, Steve Grenon, John Oxaal, and Walter Wilkinson. In each instance, Defendant's argument is based on the standards it cites in pages 1–3 of its motion and can generally be categorized as either challenging a particular

portion of the declaration because: 1) Defendant believes it conflicts with prior testimony, or 2) it is not based on personal knowledge. (*Id.* at 1–3.) Defendant's personal knowledge argument can be further categorized into objections that the portion in question: a) is phrased in terms of the declarant's "understanding" or "belief," b) contains conclusory allegations and/or speculation without identifying any individual or circumstance associated with the statement, or c) amounts to a legal conclusion or an otherwise improper characterization. While the Court has reviewed each specific request, the Court finds that it need not address them individually at this juncture. For the purposes of this opinion, the Court will discuss and rule on each of the general categories Defendant has raised as being objectionable. Then, if necessary during the trial, specific objections may be raised and ruled on at that time.

With regard to the first category, the Court has examined each of the instances in which Defendant believes a particular declarant's statements contradict his previous testimony or the prior testimony of other witnesses. The Court finds that none of the cited instances present such glaring contradictions as to be worthy of being stricken from the record at this stage. As an example, the Court will analyze one of Defendant's specific requests that is representative of Defendant's objections in this category.

Defendant seeks to have statements regarding Mr. Bright's authority to bind VMI stricken from the record by arguing that they contradict Bright's deposition testimony. Defendant also argues that such contradiction is made "all the more clear" by the testimony of John Oxaal and Walter Wilkinson. Specifically, Defendant cites the portion of paragraph 4 of Mr. Bright's declaration which reads: "I had sole authority to act on behalf of the [VMI] Board of Directors . . ." as well as paragraph 33 which states that "[w]ith respect to VMI, I, along with John Oxaal, had authority from the VMI Board of Directors to negotiate a deal with ATL. Specifically, we had the authority to bind VMI to the agreement with ATL as reflected in the provisions of the Term Sheet." (Bright Decl., ¶ 4.) Defendant argues these statements are in conflict with the following portions of Bright's deposition testimony:

"Q Did you ever go on the board of Volumetrics?

A No, sir.

Q Did you ever hold an office in Volumetrics?

A No, sir.

Q Were you ever in a position of making decisions on behalf of Volumetrics?

A Not independently. I would have had to have gotten the approval of the board or the chairman of the board.

Q Did you have any, did you ever have any official authority with respect to Volumetrics?

A No, sir . . . . I want to go back to the other question. Official responsibility, did I ever have any official authority, . . . I want to retract my answer because I think by virtue of what the Board authorized me to do that I probably had authority.

(Page 84, Line 16—Page 85, Line 15.)

Q Mr. Bright, before lunch one of the last things we talked about was your authority for VMI and you said something like that the Board had authorized you to do something. Did the point in time come when the Board of Volumetrics authorized you to take certain actions?

A Yes.

\* \* \* \* \* \*

Q ... what authority did they give you? Lets best take care of that. What authority did the board give you?

A Yes. Well, they gave me authority to try and find a partner for Volumetrics. (Page 90, Line 19—Page 91, Line 19.)"

(Def.'s Mot. to Strike Portions of Declarations Submitted by Volumetrics, at 3–4.)

■ First, with respect to Defendant's argument that alleged contradictions between Bright's declaration and his previous testimony are made "all the more clear" by the testimony of others, the Court is guided by the *Cleveland v. Policy Mgmt. Sys. Corp.* case. In principle, Defendant is correct in the proposition for which it cites this case, however, the rule is narrower than the way in which Defendant applies it. "[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her *own* previous sworn statement (by, say, filing a later affidavit that flatly contradicts *that party's* earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. at 806, 119 S.Ct. at 1603, 143 L.Ed.2d 966 (emphasis supplied). Thus, affidavits are not fatally flawed merely because they conflict with *any* of the deposition testimony in a particular case.

Thus, in order for the information Defendant cites as being an item that may rise to the level of material which may warrant being stricken, the contradictions relied upon must be among statements from a particular person, and not as between statements of different individuals. Accordingly, the Court will not consider any inconsistencies between Bright's declaration and the previous deposition testimony of Oxaal and Wilkinson as a basis for this portion of the Motion to Strike.

As for any of Bright's own previous testimony which may not directly mirror the statements in his declaration regarding his authority, the Court finds the declaration does not flatly contradict Bright's deposition statements, but rather, it serves only to clarify or augment his deposition. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995) ("Disregarding ... those parts of [Plaintiff]'s affidavit that contradict, as distinct from merely clarifying or augmenting, his deposition ....."). Overall, Bright's deposition seems to indicate that the scope of his authority was not conclusively defined, he simply was "to try and find a partner for Volumetrics." This does not directly conflict with Bright's declaration statements that he "had sole authority to act on behalf of the [VMI] Board of Directors ..." or that he, " along with John Oxaal, had authority from the VMI Board of Directors to negotiate a deal with ATL." The scope of authority Bright describes in his present declaration could be viewed as being a part of his overarching mission to find a partner for VMI.

The Court will now turn to Defendant's second basis for its motion to strike portions of the declarations, that is, Defendant's argument that the declarants lack personal knowledge because their specific statements either: a) are phrased in terms of their "understanding" or "belief," b) contain conclusory allegations and/or speculation without identifying any individual or circumstance associated with the statement, or c) amount to a legal conclusion or otherwise improper characterization.

The Court has reviewed each specific request, and finds that none of the individual instances where Defendant argues the declarant lacks personal knowledge is so deficient as to warrant being stricken from the record at this stage. As mentioned above, if necessary during the trial, specific objections may be raised and ruled on at that time. Again, as an example, the Court will analyze one of Defendant's spe-

cific requests that is representative of all Defendant's objections in each category.

■ Defendant's request to strike "[a]ny statements by Mr. Bright regarding his 'understanding' or 'belief' " is typical of the first category of Defendant's personal knowledge objections. (Mot. to Strike Portions of Decs. Submitted By Volumetrics, at 8–9.) Specifically, one of the paragraphs of Bright's declaration that Defendant believes should be stricken is number 58, "to the extent it states Mr. Bright's understanding of Mr. Croniser's statements or his belief as to what Mr. Croniser knew regarding the Agilent negotiations." (*Id.* at 9.) Defendant's qualms with this paragraph are largely based on semantics. While Bright does use the phrases "I understood" and "I believe," those words do not *per se* indicate that he lacks personal knowledge. Rather, the words denote that Bright is offering his opinion or inference. Such inferences are permissible provided they are based on personal knowledge and have a factual foundation. *See Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir.1998); *accord Carroll v. Town of University Park, Maryland,* 1998 WL 390617 *4, n. 4 (4th Cir.1998) (unpublished) ("Although statements in affidavits can include inferences and opinions, those inferences must be based on personal knowledge and have a factual foundation."). The Court finds that there are facts within Bright's declaration, and elsewhere in the record, that could potentially support the position Bright takes in paragraph 58. (*See e.g.* Bright Decl., ¶¶ 22–29, 48, 51–55.) Accordingly, the Court will not strike paragraph 58 as it merely uses the words "understood" and "believe" to express inferences or opinions of the declarant, which are based on personal knowledge and supported by a factual foundation.

Defendant's second main argument within the lack of personal knowledge category is that certain statements in the declarations contain conclusory allegations and/or speculation and fail to identify any individual or circumstance associated with the statement. For example, regarding the declaration of Steve Grenon, Defendant moves to strike "[e]very reference in which Grenon says that 'ATL' said or did anything where there is no specific reference to an individual and circumstances under which the statement or action was made." (Mot. to Strike Portions of Decs. Submitted By Volumetrics, at 11.) One such instance "would include Paragraph 14" in which Grenon states that "ATL repeatedly stressed ... that the key to the partnership relationship between ATL and VMI was a fast 'time to market' for the joint product." (*Id.;* Grenon Decl., ¶ 14.)

Contrary to Defendant's assertion, paragraph 14 of Grenon's declaration does identify the circumstances when "ATL stressed" a point, namely, "in the agenda [the declaration previously described this "agenda" in paragraph 12], during the February meetings, and throughout the relationship ...." (Grenon ¶ 14.) The agenda for the February 2000 meetings also makes clear that Grenon's statement is not speculation or a conclusory allegation in that it lists three "[e]mphases" for the meetings with "[t]ime to market" at the top of the list. (Dep. Exh. 317; *see also* Peterson Dep., at 92 indicating that, during the February 2000 meetings, "we[ATL]indicated that ... our interest was in their technology only to the extent that it ... could afford us quick time to market. My desire was to get to market as quickly as possible with real-time 3D.") In addition, Grenon attended the February 2000 meetings and thus had personal knowledge of the events that took place therein. As for identifying an individual associated with the declaration's assertion, ATL is a corporate "individual" and therefore has the ability to "stress" a point

through the actions of its agents. ATL's engineers David Roundhill and Roy Peterson thus, on behalf of ATL, emphasized the time to market for the potential product. The Court finds that Grenon had personal knowledge sufficient to support the statements in paragraph 14 of his declaration.

Defendant's final argument within the lack of personal knowledge category is that certain portions of the declarations contain legal conclusions or otherwise improperly characterize evidence. An example of this argument is Defendant's objection to paragraphs 22–31 of Bright's declaration which, Defendant contends, "characterize[ ] the meaning of Exhibit 485" and "state[ ] a legal conclusion in summary fashion." (Mot. to Strike Portions of Decs. Submitted By Volumetrics, at 9.) Deposition Exhibit 485 is a document entitled "Volumetrics Term Sheet" which, Bright's declaration asserts, was used "as the basis to negotiate the terms of an agreement between the parties" and ultimately evolved into Exhibit 486, which Bright refers to as "the agreed-upon Term Sheet ...." (Bright Decl., ¶ 22.) Bright's statements concerning these documents are based on his personal knowledge of the discussions between VMI and ATL, in which he participated extensively as VMI's lead negotiator.

Plaintiff claims these discussions resulted in a contract and/or a joint venture agreement which it alleges Defendant breached. (Compl., ¶¶ 56–60.) In determining whether an agreement could have arisen by implication, the state of mind of the parties is directly relevant. *See Brendsel v. Marvin Lumber and Cedar Co.,* 2002 WL 369917 at *3, 30 Fed.Appx. 221 (4th Cir.2002) ("Disputes about whether a contract has or has not been formed as the result of words and conduct over a period of time are quintessentially disputes about 'states of mind' ....") (citing *Char-*

*bonnages de France v. Smith,* 597 F.2d 406, 414–15 (4th Cir.1979)). Thus, Bright's characterization and accompanying understanding of Exhibits 485 and 486 is based on personal knowledge and is therefore relevant and admissible. To the extent such characterizations might be construed as legal conclusions, the Court, in deciding the motion for summary judgment, has drawn its own conclusions without being swayed by any potentially impermissible material. *See e.g. Flair Broad. Corp. v. Powers,* 733 F.Supp. 179, 183 n. 6 (S.D.N.Y.1990) ("to the extent that any of the affidavits contain legal argument or conclusion, the parties are assured that those impermissible sections were not considered by us on this motion.").

In summary, the Court is mindful of the general notion that " 'the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party ....' " *Richardson v. Oldham,* 12 F.3d 1373, 1378 n. 17 (5th Cir.1994) (quoting *Lodge Hall Music, Inc. v. Waco Wrangler Club, Inc.,* 831 F.2d 77, 80 (5th Cir.1987)); *accord* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738, at 343–44 (3d ed.1998). Indeed, since Defendant's motions to strike are made in the context of the Court's consideration of Defendant's summary judgment motion, it must be remembered that the burden of proving that there is no genuine issue of material fact rests on the moving party and the opposing party is entitled to all of the favorable inferences that reasonably may be drawn from the papers before the court. With these principles in mind, the Court has examined each of Defendant's specific requests to strike portions of the Bright, Grenon, Oxaal, and Wilkinson declarations and analyzed them in a manner similar to the categorical examples discussed above. After such review the Court is unmoved by Defendant's argu-

ments in support of its specific requests to strike and, therefore, will DENY Defendant's motion to strike in its entirety.

## 2. Motion to Strike Volumetrics' Statement of Specific Facts

■ Defendant's second motion to strike [Document # 58] is directed towards Plaintiff's "Statement of Specific Facts," which Plaintiff submitted along with its Response Memorandum in Opposition to Defendant's Motion for Summary Judgment. The fact statement is thirty-eight pages long and contains one-hundred-twenty-nine individually numbered paragraphs, all in addition to Plaintiff's twenty page Memorandum in Opposition which itself contains a factual statement section.

Local Rules 56.1(c) and 7.3(d) provide that responsive briefs on motions for summary judgement are limited to twenty (20) pages. Local Rule 56.1(e) provides that a responsive brief should set out "the specific, authenticated facts existing in the record or set forth in accompanying affidavits that would be sufficient to support a jury finding of the existence of the disputed elements."

Plaintiff's "Statement of Specific Facts" greatly exceeds the applicable page limit mandated by the local rules of this Court. Further, the statement does not set forth facts which are not otherwise available in the record. Moreover, the facts the statement brings forth were largely presented in the Opposition Memorandum's own statement of facts or alleged in the Complaint. The Court therefore finds that Plaintiff's "Statement of Specific Facts," which was submitted along with its Response Memorandum in Opposition to Defendant's Motion for Summary Judgment, violates the Local Rules and lacks any utility which would justify exempting it from the Rules. Accordingly, Defendant's Motion to Strike is GRANTED and the statement is hereby STRICKEN from the record.

## B. Motion for Summary Judgment

### 1. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is considered "material" if it "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986). Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* As a result, the Court will only enter summary judgment in favor of the moving party when the record " 'shows a right to judgment with such clarity as to leave no room for controversy' " and clearly demonstrates that the non-moving party " 'cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir.1967)).

When ruling on a summary judgment motion, the Court views the evidence in the light most favorable to the non-moving party, according that party the "benefit of all reasonable inferences." *Bailey v. Blue Cross & Blue Shield of Virginia*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). The moving party bears the initial burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied*, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). Once

the moving party has met this burden, the adverse, or non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* In so doing, the adverse party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511–12; *Catawba Indian Tribe,* 978 F.2d at 1339. In other words, the non-moving party must show "more than . . . some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of his position is insufficient to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Catawba Indian Tribe,* 978 F.2d at 1339.

In its Complaint Plaintiff levels six Counts against Defendant, Defendant moves for Summary Judgment as to each of them.[1] The Court will address each in turn, although not in the order presented in the Complaint.

#### 2. Count I—Breach of Contract/Breach of Joint Venture Agreement

Plaintiff alleges that "ATL and VMI had a valid and binding contract that provided, *inter alia,* for (1) ATL to invest in VMI; (2) ATL to provide funding for VMI's research and development as directed by ATL; and (3) the parties to develop jointly the VMI–ATL ultrasound machine." (Compl., ¶ 57.) It is Plaintiff's position that the parties had a "deal" after the meeting on April 14, 2000, and that the Term Sheet documents their alleged agreement. (Compl., ¶ 28; Oxaal Dep., at 102, 138, 217; Bright Dep., at

127, 244–45, 285–86.) Defendant argues there is no genuine issue of material fact which would permit a jury to find that a binding agreement existed between ATL and VMI because, 1) even if there had been an agreement, it was too indefinite to be enforceable, and 2) even if a sufficiently definite and certain agreement had occurred, there was no requisite expression, by either party, of intent to be bound. (Brief in Sup. of Def's. Mot. for Sum. Judg., at 8–9.) Plaintiff responds by characterizing the arrangement it had with Defendant as an agreement to enter into a joint venture and, Plaintiff reasons, since a joint venture is a kind of partnership, the law of partnership governs the formation of a joint venture. (Pl.'s Memo. in Opp'n to Def.'s Mot. for Sum. Judg. (hereafter "Pl.'s Opp'n"), at 17.) Plaintiff argues, therefore, that a voluntary association of partners may be shown without proving an express agreement to form a partnership. (*Id.* at 17–18.) Plaintiff further contends that even where a defendant refuses to sign a written partnership agreement, the parties' conduct may evince their assent and nevertheless form a partnership. (*Id.* at 17–18.)

As this Count of the Complaint contains two claims for relief based upon a purported contractual relationship, the Court will address them separately.

##### i. Breach of Contract—Express Agreement

 It is hornbook law that, to be enforceable, the terms of a contract must be sufficiently definite and certain. *Lassiter v. Bank of North Carolina,* 146 N.C.App. 264, 269, 551 S.E.2d 920, 923 (2001); *Brooks v. Hackney,* 329 N.C. 166,

---

**1.** Two of the Counts contain compound claims for relief, yielding a total of eight claims. The compound claims are contained in Count I, entitled "Breach of Contract/Breach of Joint Venture Agreement" and

Count II, entitled "Fraud (Actual and Constructive)." (Compl., ¶¶ 56–68.) To the extent these counts identify claims that are independent of each other, the Court will address each claim separately.

170, 404 S.E.2d 854, 857 (1991). A contract "leaving material portions open for future agreement is nugatory and void for indefiniteness." *Boyce v. McMahan,* 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974); *accord Cheatham v. Ford Motor Co.,* 64 F.3d 656, 1995 WL 478021, at *3 (4th Cir.1995) (unpublished). In addition to setting forth its terms with the requisite level of certainty, to be enforceable a contract must contain an expression of mutual assent. That is, a manifestation of intent wherein "it is necessary that the minds of the parties meet upon a definite proposition. There is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense." *Horton v. Humble Oil & Refining Co.,* 255 N.C. 675, 679, 122 S.E.2d 716, 719 (1961) (quotations omitted).

■ Although Plaintiff devotes an enormous amount of effort to the suggestion that the Term Sheet is a binding and enforceable agreement, the Court need not devote extensive analysis to this contention as it is thoroughly belied by the record. Statements of Plaintiff's own employees and investors indicate that the document was incomplete as to its terms and did not reflect a meeting of the minds. The examples of such statements are numerous and continuous over a long record of contact between the parties.

Such examples of these statements begin as early as June 6, 2000, when one of VMI's founders, Dr. Olaf Von Ramm wrote an email to Steve Grenon, a VMI VP and its Chief Technical Officer, and spoke about needing "to bolster our bargaining position with prospects, particularly ATL." (Dep.Exh. 470.) This notion of incompleteness of the agreement is also evidenced in August 16, 2000, when Jim Mundell, VMI's VP and General Manager wrote an email to principal VMI investors Bill Bright and Walter Wilkinson on the subject of employee compensation. In it

he stated "I thought it was important to start thinking about this prior to reaching an agreement with ATL . . . ," but that the topic could be discussed "further after the next round of negotiations with ATL." (Dep.Exh. 281.) VMI's concern about the lack of an agreement is also documented by a September 6, 2000 email from Mundell to various VMI employees, including Grenon, wherein Mundell stated "[w]e are at [a] critical juncture in the *negotiations* [with ATL] . . . ." (Dep.Exh. 286) (emphasis supplied.) Mundell's email also notes that VMI's internal company policy on communication by VMI's employees with ATL would "become less restrictive after we have negotiated our deal." (*Id.*) Even more telling evidence of the non-existence of a binding contract is Mundell's final statement in the email that "[a] deal is imminent! Or at least highly likely." (Dep.Exh. 286.) As late as November 21, 2000, VMI's concern about the lack of a deal is evident from Mundell's email to Wilkinson in which Mundell states "[w]hat I think we all want to know is when can we negotiate a deal. Steve and I have voiced our concerns about having another meeting with ATL that does not start to bear fruit. We have been telling the employees, vendors, lenders and shareholders that as soon as Philips freed up the M & A people we could get our deal negotiated." (Dep.Exh. 296.) This same concern about the lack of any real contract between the parties was expressed in Bright's December 5, 2000 letter to ATL's CEO Tim Mickelson where Bright states that "[a]t the time the term sheet was prepared, we recognized that while it outlined rather precisely the structure of a transaction, it was still subject to the negotiation of a final price" and that "we still expect to negotiate with you to arrive at a fair and mutually acceptable deal." Further, with respect to what stage the parties were in, Bright proposed to have VMI representatives, at some time in the future, "meet

with you [Mickelson] and/or your team to finalize a deal that is fair to both of us." (Dep.Exh. 501.) Thus, the record plainly shows Plaintiff was well aware that its relationship with Defendant was one of on-going negotiations and that the parties had not yet entered into a binding contract.

Notwithstanding Plaintiff's numerous acknowledgments that the Term Sheet was not a final agreement, on its face the document itself cannot stand alone as a binding and enforceable contract. The document is fatally flawed in two respects: 1) it does not contain terms that are sufficiently definite to be enforceable, and 2) it does not contain the requisite expression of intent.

As to the first area, definiteness, the most critical term on which the document is materially lacking is price. Plaintiff contends that a minimum price was set at $100 million, with potential graduated increases of $20 million to be determined by the number of units sold per year. (Pl.'s Opp'n at 18; Dep. Exh. 486.) The fact that the sales volume increment blanks, which were to determine when such tremendous price increases might potentially occur, were never filled in is, in and of itself, a major area of indefiniteness.

Plaintiff in response attempts to rely upon a series of cases for the proposition that a promise to pay an amount certain plus an additional amount based on future profitability is enforceable for the minimum amount. *See e.g. George A. Fuller Co. v. Brown*, 15 F.2d 672, 677 (4th Cir. 1926) ("The promise to increase the bonus if the profits on succeeding ships should exceed the profits on the Cranford was too vague and indefinite to form the basis of

the right to recovery as to such increase, but this would not defeat the right to recover that which was definitely promised."); *Schloss v. Davis*, 213 Md. 119, 124, 131 A.2d 287, 290 (1957) ("In the instant case we think the agreement as to price [expressed as a range] was not too vague to support recovery at the minimum figure."); *Fruth v. Gaston*, 187 S.W.2d 581, 584 (Tex.Civ.App.—Austin 1945) ("If, in addition to the salary and 1% on gross sales, Gaston agreed to pay a percentage of net profits not to exceed five per cent and in no event not less than three, the law would imply a reasonable percentage within these limits; and such a promise, after Fruth had performed the services for which it was made, could not be construed as so indefinite and uncertain as to bar his recovery of any part thereof."). These cases notwithstanding, a review of the Term Sheet shows that it fails to set forth even a definitive minimum amount for the contract price.[2]

The Term Sheet also lacks definiteness in describing the "initial investment [ATL was to make] in VMI to 'retire agreed upon indebtedness.'" (Bright Decl., ¶ 24 (quoting Dep. Exh. 486, ¶ 2).) Plaintiff is correct that a contract is sufficiently definite if it contains a method for determining a term. Based on this concept Plaintiff asserts, with respect to the agreement to retire VMI's indebtedness, that although no specific amount of debt was located on the Term Sheet, the debt was "easily ascertainable." (Pl.'s Opp'n, at 19.) The Court finds, however, that nowhere in the document is the debt listed or a method for determining it described.[3]

**2.** Plaintiff alleges that the minimum was to "total $100 million (minus the development costs paid by ATL)." (Bright Decl., ¶ 28 (citing Dep. Exh. 486, ¶ 13).) However, the Term Sheet does not list what these development costs were or provide a method for determining them. (*See* Dep. Exh. ¶ 5.) Thus,

the minimum purchase price could not be arrived at with any certainty from merely examining the Term Sheet.

**3.** The Term Sheet indicates only that Plaintiff's debt was to be paid off by Defendant purchasing an undetermined amount of Plain-

Outside of being indefinite as to financial aspects, the Term Sheet is also materially lacking as to what the parties' respective duties would be. Under the Term Sheet the Product Development Program, presumably defining what the parties were to be jointly working on, was to be "described in Exhibit A (the 'Product Development Agreement')." (Dep.Exh. 486, ¶ 4.) No such exhibit exists or, if it does exist, it was not provided to the Court. Further, when referring to the "Program Product" itself, the Term Sheet states that it "needs to be defined . . . ." (*Id.* ¶ 10.) The parties were also to "agree to milestones" and the Term Sheet generally lists the issues that such milestones would need to address, but it notes that "we need to work on the rest of this paragraph . . . ." (*Id.* ¶ 6.)

All these deficiencies in the document itself indicate that the Term Sheet was merely an agreement to agree which was drafted by the parties in contemplation of a future, final agreement. The document itself states as much, and provides yet another example of its incompleteness by prefacing a paragraph with the language "[u]pon execution of the definitive agreement, ATL and Volumetrics shall jointly commence the Product Development Program (the 'Program') described in Exhibit A (the 'Product Development Agreement')." (*Id.* ¶ 4.)

The second fatal flaw in the Term Sheet is that it does not contain the requisite expression of intent. On its face, the document contains no signatures or other indicia of acceptance or approval by either Plaintiff or Defendant. Further, Plaintiff's actions were not uniformly consistent with an intent to be bound. This is evident because Plaintiff never employed a lawyer to review or formalize any terms or provisions of the Term Sheet or to negoti-

ate further with Defendant, and Plaintiff also entertained other opportunities for joint product development and/or corporate acquisition. (*See* Bright Dep., at 297 when asked "Did you ever ask any lawyer or accountant or business advisor to help you to draw up any kind of final documents between ATL and VMI?" Bright responded "No."; *see also* Wilkinson Dep., at 17–18 indicating that VMI was not represented by legal counsel in its negotiations with ATL; *and see* Wilkinson Dep., at 283–84 discussing VMI's talks with Kretz in July 2000 and stating that "we obviously had not closed the definitive agreement with ATL at that time, so we were not legally prevented from talking"; *and* Dep. Exh. 452 (same).) Additionally, the numerous occasions discussed above, wherein Plaintiff acknowledged the Term Sheet's incompleteness, also serve to indicate that Plaintiff knew Defendant did not intend to be bound by the Term Sheet. (*See* Dep. Exhs. 470, 281, 286, 296, 501.) More importantly, Plaintiff was also aware that Defendant's corporate parent, Philips Electronics, would have to approve any deal between the parties. (*See* Dep. Exhs. 296, 488.) Thus, the Term Sheet lacks any subjective indication of a meeting of the minds, and the surrounding circumstances do not provide any objective indication that the parties mutually assented to the document.

As the Term Sheet is fatally flawed in two respects which prevent it from being a binding and enforceable contract, the Court finds that, as a matter of law, Plaintiff cannot prevail on its claim of a breach of contract based upon the Term Sheet of April 14, 2000. Thus, the Court concludes no genuine issue exists as to any material fact with respect to this claim and that

---

tiff's stock at an undetermined price per share. (*See* Dep. Exh. 486, ¶ 2.) The amount of stock to be purchased and price per share

numbers were never agreed to, and the blanks were never filled. (*See* Wilkinson Dep., at 214–15.)

Defendant is entitled to judgment as a matter of law on this claim of Breach of Contract. The Court will therefore GRANT Defendant's Motion for Summary Judgment as to Plaintiff's claim for breach of an express contract as purportedly embodied in the Term Sheet.

### ii. Breach of Joint Venture Agreement—Implied Agreement

The second claim contained within Count I alleges a breach of a joint venture agreement. Independent of the Term Sheet, Plaintiff characterizes the arrangement it had with Defendant as an agreement to enter into a joint venture. (Pl.'s Opp'n, at 17.) Plaintiff reasons that, since a joint venture is a kind of partnership, the law of partnership governs the formation of a joint venture. (*Id.*) Plaintiff therefore argues that a voluntary association of partners may be shown without proving an express agreement to form a partnership and, even where a defendant refuses to sign a written partnership agreement, the parties' conduct may evince their assent and nevertheless form a partnership. (*Id.* at 17–18.) Plaintiff alleges that, pursuant to this arrangement, "the parties agreed to (1) work together to combine their technology and create a joint 2D/RT3D ultrasound machine ...; (2) share profits through an option if the machine were successful ...; (3) share losses (through loss of time and money) if the venture failed; (4) make modifications to the technology of both companies in order to make them compatible, demonstrating the ability, to some extent, of each side to control and influence the other's work ...; and (5) jointly own the resulting intellectual property." (Pl.'s Opp'n, at 17–18.)

Quite recently the North Carolina Court of Appeals engaged in a close examination of the state's law regarding joint ventures. The court concluded that "the essential elements of a joint venture are (1) an agreement[4] to engage in a single business venture with the joint sharing of profits ..., (2) with each party to the joint venture having a right in some measure to direct the conduct of the other *through a necessary fiduciary relationship.*" *Southeastern Shelter v. BTU, Inc.,* 572 S.E.2d 200, 204 (N.C.App. Dec.3, 2002) (quotation and citations omitted) (emphasis in original). The court elaborated on the second element by stating that it "requires that the parties to the agreement stand in the relation of principal, as well as agent, as to one another." *Id.* at 205 (citation omitted). While the existence of a joint venture is often a question of fact for the jury to decide, the *Southeastern Shelter* case demonstrates that it may also properly be considered upon summary judgment as a question of law. *Id.* at 203 (reviewing trial court's grant of summary judgment where, at trial level, "[d]efendants argued they were entitled to summary judgment because the evidence, as a matter of law, failed to show the existence of a joint venture.").

As the basis for its claim of "Breach of Contract/Breach of Joint Venture Agreement" Plaintiff alleges in the Complaint that "ATL and VMI had a valid and binding contract that provided, *inter alia,* for (1) ATL to invest in VMI; (2) ATL to provide funding for VMI's research and development as directed by ATL; and (3) the parties to develop jointly the VMI–ATL ultrasound machine." (Compl., ¶ 57.) As discussed previously, no express contract existed for a number of reasons; thus, the sole remaining object of the alleged joint venture could only have been for "the parties to develop jointly the VMI–ATL ultrasound machine." In working toward this goal, a "necessary fiduciary relationship" would have to have arisen

---

4. The agreement may be express or implied.

*Southeastern Shelter,* 572 S.E.2d at 204.

between Plaintiff and Defendant in order for their relationship to qualify as a joint venture. The Court, however, finds that no fiduciary relationship existed between the parties.[5]

Plaintiff alleges "[a] fiduciary relationship existed between VMI and ATL by virtue of all the facts and circumstances of their relationship, including ATL's agreement to acquire VMI; and its representations that the company was going to be folded into ATL; and that VMI should therefore function substantially as an ATL division—by working at ATL's direction and providing ATL with all its valuable proprietary and non-public information—pending completion of all the acquisition formalities." (Compl., ¶ 82.) Defendant responds by arguing that "there are no facts in this case warranting a finding that ATL had such a relationship with VMI." (Brief in Sup. of Def.'s Mot. for Sum. Judg., at 17.) Defendant further contends the parties "were business entities discussing and preparing for future negotiations" and "were operating at arms-length . . . ." (Id.) Plaintiff responds with a twofold argument. First, Plaintiff contends that "VMI and ATL were joint venture partners and thus each others' fiduciaries as a matter of law." (Pl.'s Opp'n, at 14) (quotation omitted.) Second, Plaintiff argues that "partnership aside, other facts support a finding of a fiduciary relationship, which can exist under a variety of circumstances in which there is confidence reposed on one side, and resulting domination and influence on the other." (Id.) (quotation omitted.) Defendant replies by contending that the facts cited by Plaintiff in support of its fiduciary duty claim are

unsubstantiated, and, Defendant argues that Plaintiff's reasoning is contrary to controlling authority. (Def.'s Reply to Pl.'s Opp'n, at 5.)

■ Courts have been reluctant to conclusively define the term "fiduciary relationship." *Abbitt v. Gregory,* 201 N.C. 577, 598, 160 S.E. 896, 906 (1931). In general, such a relationship may exist "where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence . . . . [I]t extends to any possible case in which a fiduciary relation exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other." *Id.* The concept of "domination and influence," or, "superiority and influence" as it is sometimes labeled, does not necessarily equate to a party's size. *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 348 (4th Cir.1998) (citing *Lazenby v. Godwin,* 40 N.C.App. 487, 253 S.E.2d 489 (1979)). "[S]ize . . . is not a reliable indicator of strength or influence. Nor is it what North Carolina courts mean by superiority. Only when one party figuratively holds all the cards—all the financial power or technical information, for example— have North Carolina courts found that the 'special circumstance' of a fiduciary relationship has arisen." *Id.* In addition, in examining the issue the Fourth Circuit has pointed out that "[a] fiduciary bears the extraordinary obligation . . . never to place his personal interest over that of the persons for whom he is obliged to act . . . . [T]hese obligations are out of place in a

---

**5.** Notwithstanding the absence of a fiduciary relationship, Plaintiff's argument regarding how the facts of this case satisfy the elements of joint venture also fails because Plaintiff inextricably ties the existence of a joint venture to the validity of the fatally flawed Term Sheet. (*See* Pl.'s Memo on *Southeastern Shel-* ter, at 5–17.) The Court, however, need not examine this alternate linchpin since its implications are evident from the Court's discussion concerning the Term Sheet's material inadequacies and, moreover, the lack of a fiduciary relationship alone bars Plaintiff's joint venture claim.

relationship involving two business entities pursuing their own business interests, which of course do not always coincide." *Id.* (quotation omitted).

■ The existence of a fiduciary relationship is often a question of fact for the jury. *Rhone–Poulenc Agro S.A. v. Monsanto Co.*, 73 F.Supp.2d 540, 546 (M.D.N.C.1999) (citing *Speck v. North Carolina Dairy Found. Inc.*, 64 N.C.App. 419, 423, 307 S.E.2d 785, 789 (1983), *rev'd on other grounds* 311 N.C. 679, 319 S.E.2d 139 (1984)). However, the issue may be couched as a matter of law, and as such, this Court has found that a fiduciary relationship may not necessarily be present even though a Plaintiff has alleged " 'special circumstances' resulting in one party having 'superiority and influence' over the other." *Id.* "In North Carolina, no fiduciary relationship exists between mutually interdependent businesses with equal bargaining positions who dealt at armslength." *Id.* (citing *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C.App. 663, 391 S.E.2d 831 (1990); *Stone v. McClam*, 42 N.C.App. 393, 257 S.E.2d 78 (1979)). Before going forward to a jury, a court may examine the evidence and, even applying the "broad standard" set forth in *Abbitt v. Gregory*, may decide "the evidence [is] insufficient to submit to the jury the issue of whether a fiduciary relationship exist[s] . . . ." *Tin Originals, Inc. v. Colonial Tin Works, Inc.*, 98 N.C.App. 663, 666, 391 S.E.2d 831, 833 (1990). For example, as a matter of law, no fiduciary relationship was found between a manufacturer and its exclusive distributor, *Tin Originals*, 98 N.C.App. at 665–66, 391 S.E.2d at 832–33, nor between a franchisee and its franchisor. *Broussard*, 155 F.3d at 347–49.

■ The first half of Plaintiff's argument, wherein it contends that because VMI and ATL were joint venture partners they were therefore each others' fiducia-

ries as a matter of law, misconstrues the requirements for a joint venture. A joint venture cannot exist without a "*necessary fiduciary relationship.*" *Southeastern Shelter*, 572 S.E.2d at 204 (emphasis in original). Therefore, the Court must first examine whether a fiduciary relationship in fact existed in order to determine whether a joint venture could then have arisen between the parties.

The second half of Plaintiff's argument is that it "reposed confidence in ATL, which resulted in ATL's dominance and influence over VMI." (Memo in Opp'n, at 15.) In support, Plaintiff lists nine reasons why a jury could "find that ATL owed VMI a fiduciary duty . . . ." (*Id.* at 14.) The Court will address each in turn.

■ First on this list is Plaintiff's contention that "ATL knew that VMI was in a vulnerable financial position and needed to move quickly to finalize a strategic partnership." (*Id.*) Plaintiff's evidence indicates that it was in an unhealthy financial state at the time of its discussions with Defendant, and that it readily admitted as much to Defendant. (*See e.g.* Soquet Dep., at 170–72; Bright Decl., ¶ 6.) However, this disclosure does not indicate that Defendant held "all the cards—all the financial power or technical information," as North Carolina law requires. If, as a matter of law, based upon the facts in *Broussard*, "mutually interdependent businesses" who "deal at arms length" cannot be fiduciaries, then Plaintiff and Defendant, who at all times remained *independent* businesses and dealt at arms length, plainly cannot be considered fiduciaries either. *See e.g. Broussard* 155 F.3d at 347 (finding that, in a case where ten owners of Meineke Discount Muffler franchises sued franchisor Meineke Discount Muffler Shops, Inc., "[t]he district court erred by allowing plaintiffs to advance their claims for breach of fiduciary duty when there is

no indication that North Carolina law would recognize the existence of a fiduciary relationship between franchisee and franchisor.").

Second, Plaintiff argues that "[t]he parties agreed upon and executed a plan to build a joint 2D/3D ultrasound machine." (Pl.'s Opp'n at 14.) Plaintiff cites the Term Sheet (Dep.Exh. 486) in support of its belief that a fiduciary relationship was created. As previously discussed, the Term Sheet contains various material inadequacies as to the nature of any conceivable "plan" and was not an enforceable agreement between the parties. Consequently, this alleged reason does not support the finding of a fiduciary duty.

As a third reason Plaintiff states, "ATL and VMI exchanged highly proprietary information throughout the relationship not typical in an arms-length transaction." (*Id.*) As discussed below, this sharing of information occurred pursuant to a mutual non-disclosure agreement, which the parties entered into at the outset of their discussions. (*See* Dep. Exh. 396.) The Mutual Non-Disclosure Agreement between the parties was specifically executed in contemplation that the parties would be sharing information that was "proprietary and confidential in nature . . . ." (*Id.*) The agreement states that, with regard to such information, "the receiving party shall safeguard such CONFIDENTIAL INFORMATION obtained from the disclos-

ing party to the same degree that it safeguards confidential information pertaining to its own business and operations." (Dep. Exh. 396) (emphasis in original.) Thus, any obligation between the parties that might have arisen as a result of their sharing of information was defined by this document, not by fiduciary principles allegedly arising outside it. *See Broussard* 155 F.3d at 347 (" '[P]arties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the U.C.C.' ") (quoting *Branch Banking and Trust Co. v. Thompson,* 107 N.C.App. 53, 61, 418 S.E.2d 694, 699 (1992)).

The fourth, fifth, sixth, and seventh reasons all allege that Defendant had some manner of control over Plaintiff's day-to-day operations and business decisions.[6] Specifically, Plaintiff contends that "[4] ATL directed the work of VMI's engineers, [5] ATL approved the compensation package of VMI's engineers so that the two parties' packages would be 'compatible' and 'equitable,' [6] ATL approved VMI's budget and engineering resources schedule, [7] ATL approved new hires VMI needed to complete the joint work on ATL's timetable." (Pl.'s Opp'n at 14–15.)

Beginning with reason number four, Plaintiff's references in support of this reason merely illustrate that, in attempting to

---

**6.** Plaintiff also endeavors to illustrate this general notion of "control" in its supplemental memorandum (filed at the Court's request) on the *Southeastern Shelter* decision. (*See* Pl.'s Supp. Memo. on *Southeastern Shelter Corp. v. BTU, Inc.,* at 8–17.) Plaintiff's Supplemental Memorandum cites substantially the same portions of the record in support of its contentions regarding control, as are cited in its Memorandum in Opposition to Defendant's Motion for Summary Judgment. To some degree the argument Plaintiff makes in its Supplemental Memorandum, wherein it contends "the parties both had control over the joint venture," is inconsistent with the argument it advances in its Memorandum in Opposition to Defendant's Motion for Summary Judgment, which contends that Defendant alone exercised control over Plaintiff. (*Compare Id., with* Pl.'s Opp'n, at 14–15.) However, to the extent that different portions of the record are cited in the Supplemental Memorandum than in the Memorandum in Opposition, the Court finds they are patently similar in nature and fail to evidence control, by either party, for the same reasons as discussed in the text below.

integrate their two machines into one, engineers from the two companies collaborated on specifications and mutually made suggestions to, and requests of, each other, none of which were obligatory or binding. (*See e.g.* Grenon Decl., ¶ 35; VMI, Inc.'s Memo On *Southeastern Shelter Corp. v. BTU, Inc.,* at 211–13.) Defendant's actions on the project were parallel with Plaintiff's and did not rise to the level of "directing" Plaintiff. This is evident based upon the statement of VMI's Steve Grenon who himself indicated that "[t]he product design plan called for a parallel but separate development effort in which ATL would continue working on its Level 11C 2D ultrasound machine, and VMI would work on integrating its RT3D technology into the Level 11C, and, later in the development, the two technologies would be merged into one machine." (Grenon Decl., ¶ 15; *see also* Grenon Dep., at 281 where he states, "[m]y boss was the [VMI] board of directors;" *see also* Grenon Dep., at 282–83 where, in response to whether he acted on a request from Croniser without consulting Bright, Oxaal, or Wilkinson, Grenon indicates: "I don't recall but—I just don't recall if I consulted them, but I'm certain I did.") None of these specific references suggest that ATL was controlling VMI's activities.

With respect to reason five, VMI contends that ATL controlled or directed the compensation of VMI employees. At best, the evidence offered by VMI on the subject only indicates ATL made suggestions to VMI, but that the final decisions as to employee compensation were made internally by VMI.[7] (*See e.g.* Grenon Dep., at 269 stating that Croniser played an "indi-

rect" role in putting together VMI's employee incentive package; *see also* Grenon Dep., at 277 where he stated that VMI's employee compensation package was "waiting for [VMI] board approval ....")

Plaintiff's sixth reason suggesting that control was being exercised by ATL over VMI alleges that ATL was approving VMI's budget and engineering resource schedule. Plaintiff's proof of this point, however, does not show any actual approvals, but rather describes potential engineering budgets to be maintained. (Grenon Decl., ¶ 36.) Grenon states, in his declaration, his personal impression that "ATL approved the budget ...." But the documents Plaintiff offers in support of this impression only show mutual discussions about the budget issues and offer no evidence of approval. (Pl.'s Opp'n Appx., at 56–59.) In general, this reason is premised on the same facts and circumstances surrounding reason five which, here too, simply reflect a two-way street where the parties each attended to their own operations but with an eye towards being compatible in the future should an agreement between them eventually be worked out.

Construing the facts in the light most favorable to Plaintiff, reason seven, that is that ATL approved new hires VMI needed to complete the proposed joint machine on ATL's timetable, does appear to have some, colorable support arising solely from the statements of VMI's Bright and Grenon. Bright asserts that ATL employee Croniser approved the hiring and compensation of two VMI employees. (Bright Decl., ¶ 38.) Grenon also mentions ATL's approval of one of those new hirings.

---

7. Moreover, contrary to Plaintiff's argument, reason five serves much more readily as evidence that Defendant did not control Plaintiff, but rather that the parties each strove to be on equal footing. (*See e.g.* Oxaal Dep., at 269 "I knew that we needed to get our compensation package in line with ATL's compensation package so that when the two companies ultimately came together there wouldn't be a huge problem trying to, you know, get them— you know, there wouldn't be this huge discrepancy between ATL employees and VMI employees.")

(Grenon Decl., ¶ 35(f).) Plaintiff, however, does not cite any other evidence supporting these assertions. In addition, Plaintiff fails to offer a description of how Croniser allegedly gave such approval. There is nothing that Plaintiff has shown to indicate that its decision-making process was any different from the way it had always been, that is, with VMI making all of its final decisions with respect to the project internally. Even assuming that Croniser, in some fashion, gave the nod to VMI to hire two employees, this act alone is not sufficient to establish a genuine issue of material fact as to the existence of a fiduciary relationship between the parties. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511, 91 L.Ed.2d 202 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted)).

For its eighth reason Plaintiff states that "[t]he companies operated like 'one company' and ATL considered the companies to be 'on the same team.'"[8] (Pl.'s Opp'n, at 15.) Plaintiff's references to the record merely illustrate the undisputed facts that engineers from the two companies collaborated in the hopes of ultimately combining their individual machines into a joint product. (*Compare* Grenon Decl., ¶¶ 31–42, *with* Grenon Decl., ¶ 15.) Although Plaintiff alleges in its Opposition Memorandum that the companies seemed to be "one" or a "team," based upon the evidence presented the Court can only conclude that the parties remained separate entities motivated by their own business interests. Moreover, following Plaintiff's argument,

a franchisee and a franchisor might be considered to operate like they are "one company" or "on the same team," but North Carolina law dictates that a fiduciary duty does not arise solely by virtue of the franchisee/franchisor relationship. *See Broussard*, 155 F.3d at 349. Similarly, the Court finds that the argument presented by Plaintiff does not provide a basis for determining that a fiduciary relationship automatically arose between Plaintiff and Defendant simply because some individuals believed the parties were operating like one company or that they were on the same team.

Lastly, VMI offers a ninth reason why it believes that a fiduciary relationship existed. In particular, Plaintiff states that "[e]arly in the relationship, ATL asked that VMI not pursue other opportunities." Even viewing the evidence in the light most favorable to Plaintiff and assuming Defendant made such a request, there is no evidence in the record suggesting that such a request rose to a level of domination and influence being exerted over VMI by ATL. Indeed, although Plaintiff asserts it abided by the request at first, it was not dominated by any such request. In fact Plaintiff later entertained other opportunities, and the evidence indicates Plaintiff ultimately turned them down because it believed it had a business agreement with Defendant, not specifically because Defendant had requested Plaintiff not pursue other opportunities. (*Compare* Oxaal Dep., at 200–01 and Bright Decl., ¶ 16, *with* Wilkinson Dep., at 283–84, Dep. Exh. 452; Oxaal Dep., at 202–04, Bright Decl.,

---

**8.** In support of this reason Plaintiff cites Grenon's Declaration ¶¶ 23, 31–42 and Bright's Declaration ¶ 40. The "one company" quote is taken from ¶ 31 of Grenon's Declaration and also appears to generally reflect the sentiments expressed in ¶ 40 of Bright's Declaration. The "on the same team" quote comes from ¶ 23 of Grenon's Declaration who alleg-

es he heard the statement from ATL's David Roundhill who, in turn, was relaying the statement from ATL's Dave Croniser. Regardless of what some individuals' personal impressions may have been at a particular time, there is no evidence presented to indicate VMI and ATL acted or performed as though they were one company.

¶ 42, Oxaal Decl., ¶ 35.) Accordingly, a fiduciary relationship cannot be found to arise from such a request by ATL, even if it were made.

Apart from the fact that the nine reasons given by Plaintiff do not support the finding of a fiduciary relationship, the Court is also guided by the *Southeastern Shelter* case. There the North Carolina Court of Appeals found no joint venture existed where the plaintiff alleged that the parties had entered into a joint venture agreement worth $250,000. *Southeastern Shelter*, 572 S.E.2d at 202–03. In *Southeastern Shelter*, the plaintiff specifically alleged:

> defendants would pay plaintiffs a $50,000.00 advance [$25,000 of which was actually paid] good faith payment, with the remaining $200,000.00 to be paid by a promissory note. In exchange, plaintiffs would assist defendants with entry into the fireproofing business by: (a) providing use of [Plaintiff] SES's offices, facilities and equipment through 1 August 1999; (b) encouraging SES's employees to accept employment with defendants; (c) assuring Chesson [Plaintiff's President and majority shareholder] would provide services as a consultant in order to train and advise defendants through 1 August 1999; (d) assuring Chesson would assist defendants in procuring $1,000,000.00 in contracts for the application of fireproofing materials through 1 August 1999; (e) assuring Chesson would provide services as a consultant on a contract basis after 1 August 1999; (f) providing SES's telephone number for BTU's use; and (g) transferring certain assets to defendants no later than 1 August 1999. In essence, plaintiffs would provide their knowledge, experience, goodwill, proprietary information and assets, to enable defendants to learn and enter the fireproofing business.

*Id.* at 203. In addition to these alleged facts, the court of appeals specifically described the following facts: "From 1 March 1999 through 21 June 1999, BTU bid on, obtained, and performed fireproofing contracts, used plaintiffs' office, equipment and employees to conduct its day-to-day operations, and benefitted from Chesson's knowledge and expertise by receiving numerous contracts with third parties for the application of fireproofing materials." *Id.*

The facts the plaintiff alleged and the facts the court of appeals specifically described in *Southeastern Shelter* indicated a far more extensive bond between the parties than the evidence in the present case before the Court. In particular, in the case before the Court no money ever passed between the parties, each party used their own facilities which were on opposite sides of the country, neither party's employees took employment with the other party—nor were they encouraged to do so, none of Plaintiff's representatives were obligated to provide services as a consultant to train and advise Defendant. In addition, Plaintiff was not required to assist Defendant in procuring contracts for the application, use, or sale of the envisioned joint ultrasound machine. If a joint venture did not exist in *Southeastern Shelter*, then one assuredly did not exist here. Furthermore, while the facts of *Southeastern Shelter* at least allowed the court of appeals to adopt the defendant's argument and find the existence of an asset purchase contract, the same result cannot be reached here because the Term Sheet itself does not qualify as a contract between the parties and, unlike *Southeastern Shelter*, no money ever exchanged hands between the parties.

In summary, Plaintiff has not shown any facts supporting the existence of a fiduciary relationship between the parties.

Plaintiff was at all times a wholly independent company from Defendant and controlled its own negotiations, strategic decisions, business operations, and technical development with respect to the project. As the Fourth Circuit has stated, fiduciary "obligations are out of place in a relationship involving two business entities pursuing their own business interests, which of course do not always coincide." *Broussard*, 155 F.3d at 348. Without this indispensable element, Plaintiff cannot show the existence of a joint venture.

The Court therefore finds, as a matter of law, that Plaintiff cannot prevail under any circumstances and, thus, no genuine issue exists as to any material fact concerning whether or not there was a joint venture agreement between the parties. Accordingly, Defendant's Motion for Summary Judgment is GRANTED as to Plaintiff's claim for breach of joint venture agreement.[9]

### 3. Count V Breach of Fiduciary Duty

Within its analysis of Plaintiff's joint venture claim the Court discussed at length the parties' arguments concerning fiduciary duty. As explained therein, Plaintiff has failed to present sufficient evidence showing the existence of any genuine issue as to a material fact concerning whether a fiduciary responsibility arose between the parties. Accordingly, there are no circumstances under which Plaintiff can prevail on its claim for breach of fiduciary duty and the Court will therefore GRANT Defendant's motion for Summary Judgment as to Plaintiff's claim of breach of fiduciary duty.

### 4. Count II—Constructive Fraud

Count II of the Complaint brings claims for both actual and constructive fraud. As these claims are comprised of different elements, the Court will address them separately. Plaintiff couches its constructive fraud claim as an alternative argument to actual fraud, and alleges that "there was a relationship of trust and confidence between VMI and ATL, which led up to and surrounded ATL's unfair extraction of VMI's confidential information and the work of its engineers over more than ten months, which stemmed from ATL's taking advantage of this position of trust for ATL's own benefit." (Compl., ¶ 65.)

■■■■ "The elements of a constructive fraud claim are proof of circumstances '(1) which created the relation of trust and confidence [the 'fiduciary' relationship], and (2) [which] led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust to the hurt of plaintiff.'" *Keener Lumber Co., Inc. v. Perry*, 149 N.C.App. 19, 28, 560

---

9. Plaintiff's argument that "ATL did not move for summary judgment on the existence of a Joint Venture ..." is without merit. (VMI's Memo. on *Southeastern Shelter Corp. v. BTU, Inc.*, at 4.) Defendant's Motion for Summary Judgment plainly states that "Defendant ... moves for summary judgment on all claims and issues ..." and argues that Defendant "is entitled to a judgment on all claims and issues as a matter of law." (Def.'s Mot. for Sum. Judg., at 1.) It is irrelevant that, until it filed a supplemental brief (as directed by the Court) on the recently-decided *Southeastern Shelter* case, Defendant did not label its argument as an attack on Plaintiff's joint venture claim as such, but chose instead to proceed by arguing that Plaintiff could not make out a case for breach of contract on any basis. As North Carolina law indicates, joint venture requires the existence of some form of agreement, whether express or implied. Defendant has consistently argued that, for a myriad of reasons, the parties had no agreement, whether expressed in the Term Sheet or implied by the parties' actions and circumstances. This argument is equally effective whether Defendant attaches a label to it that signifies it was directed towards Plaintiff's contractual claim or to its joint venture claim.

S.E.2d 817, 823 (2002) (quoting *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981)) ("the 'fiduciary' relationship" language added by the *Keener* court). A claim of constructive fraud differs from actual fraud because it is based on a confidential relationship rather than a specific misrepresentation. *Terry*, 302 N.C. at 85, 273 S.E.2d at 678–79. With constructive fraud there is no requirement of allegations of dishonesty or intent to deceive, as constructive fraud is presumed from the nature of the relationship. *Sidden v. Mailman*, 137 N.C.App. 669, 677–78, 529 S.E.2d 266, 272 (2000). "Put simply, a plaintiff must show (1) the existence of a fiduciary duty, and (2) a breach of that duty." *Keener*, 149 N.C.App. at 28, 560 S.E.2d at 823.

In the present case, Plaintiff's constructive fraud claim is dependent on the existence of a fiduciary duty. The Court has thoroughly discussed why no such duty was present under the facts of this case and can therefore summarily conclude that Plaintiff cannot maintain its constructive fraud claim. Accordingly, there is no genuine issue as to any material fact concerning the existence of a claim for constructive fraud, and therefore, the Court will GRANT Defendant's Motion for Summary Judgment as to Plaintiff's constructive fraud claim.[10]

### 5. Count VI—Unjust Enrichment

Plaintiff sets forth its claim for unjust enrichment by alleging that "Defendant ATL induced VMI to confer numerous and substantial benefits to ATL, including but not limited to: (1) giving its competitor ATL significant proprietary and confidential information about its products, business plans, personnel, finances, and in-

ternal processes; and (2) expending tremendous resources in developing the VMI–ATL combined ultrasound machine and sharing the results of that research and development with ATL." (Compl., ¶ 88.) Plaintiff also charges that "ATL expected or reasonably should have expected to pay for the value of such benefits" and "ATL has knowledge of the benefits that VMI has conferred on it" and that "ATL's retention of the value of the benefits conferred on it by VMI is inequitable and constitutes unjust enrichment." (Compl., ¶¶ 88, 89, 90.)

Defendant argues against the claim contending that, as a standard business practice, in the course of discussing a potential relationship it merely "requested information from VMI with which ATL could evaluate VMI's viability." (Def.'s Brief in Sup. of Mot. for Sum. Judg., at 20.) Defendant also points to a "Mutual Nondisclosure Agreement" executed between the parties at the onset of their relationship in December of 1999 and contends all information shared between them was exchanged pursuant to that agreement. (*Id.* at 20; *see also* Dep. Exh. 396 Mutual Nondisclosure Agreement.) Defendant further argues that "VMI has provided no evidence that ATL or Philips has put VMI's information to any use beyond evaluating VMI as a potential investment." (*Id.*)

A claim of unjust enrichment is an alternative to a claim based on breach of contract whereby, upon the absence of an actual agreement between the parties, the court implies that a "quasi-contract" existed and permits a plaintiff to bring an action in restitution to recover the amount of the benefit conferred on the defendant. *See Horack v. Southern Real*

---

**10.** As the caselaw cited in this section indicates, constructive fraud is distinct from actual fraud. Therefore, although Plaintiff alleges both constructive and actual fraud within the same Count, the Court's grant of summary judgment as to this claim has no effect on Plaintiff's claim of actual fraud.

*Estate Co. of Charlotte, Inc.,* 150 N.C.App. 305, 311, 563 S.E.2d 47, 52 (2002) ("In order to prevent unjust enrichment, a plaintiff may recover in *quantum meruit* on an implied contract theory for the reasonable value of services rendered to and accepted by a defendant."). Such an action for recovery against someone who was unjustly enriched is known as an action in *quantum meruit. Id.* "To recover in *quantum meruit,* [a] plaintiff must show (1) services were rendered to defendants; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously." *Scott v. United Carolina Bank,* 130 N.C.App. 426, 429, 503 S.E.2d 149, 152 (1998) (quotation omitted). "*Quantum meruit* claims require a showing that both parties understood that services were rendered with the expectation of payment." *Id.* (citation omitted). The law creates a presumption that an expectation of payment exists unless "the services are rendered gratuitously or *in discharge of some obligation.*" *Atlantic Coast Line R. Co. v. State Highway Commission,* 268 N.C. 92, 96, 150 S.E.2d 70, 73 (1966) (emphasis in original). The expectation of payment must arise at the time the alleged enrichment was rendered, and not thereafter. *Twiford v. Waterfield,* 240 N.C. 582, 585, 83 S.E.2d 548, 551 (1954) ("Where a party has voluntarily done an act or rendered a service, and there was no intention at the time that he should charge therefor or understanding that the other should pay, he will not be permitted to recover, for that which was intended originally as a gratuity cannot subsequently be turned into a charge. The law cannot imply a promise contrary to the intention of the parties."); *see also Everitt v. Walker,* 109 N.C. 129, 13 S.E. 860, 861 (1891) ("[Plaintiff] promised her sister not simply to care

for, but to care for and support, her child. She said nothing of compensation at the time she made the promise, or at any time afterwards, until she brought this action .... This she cannot do.").

■ In the present case the Court finds the Mutual Nondisclosure Agreement, which Plaintiff generated and both parties agreed to at the onset of their relationship, provides definitive evidence that Plaintiff's claim for unjust enrichment cannot succeed as a matter of law. (*See* Dep. Exh. 396.)

The entire agreement is relevant, however the most pertinent part reads:

> either party may disclose to the other or either party may acquire knowledge of information and data belonging to the other (including, but not limited to, trade secrets, processes, formulae, proprietary programs, software packages, technical know-how, methods and procedures of operation, user's guides, instruction manuals, and other materials) which have been developed by the other party at its time, skill and expense, are valuable assets of the other party, and are confidential and proprietary in nature ....

(Dep.Exh. 396, ¶ 2.) Plaintiff alleges that the benefits it conferred upon Defendant were of essentially two types: 1) those associated with typical due diligence ("business plans, personnel, finances, internal processes"), and 2) the results of research and development Plaintiff generated in developing the potential combined ultrasound machine. (*See* Compl., ¶ 88.) The Mutual Nondisclosure Agreement specifically contemplates the sharing of both these types of information.[11] The agreement provides for the exchange of

---

11. Indeed, in its "including but not limited to" list of coverage, the agreement specifically names some of the very benefits Plaintiff claims were unjustly conferred: "processes," "technical know-how," and "confidential and proprietary" information. (Dep.Exh. 396, ¶ 2.)

such benefits even where they "have been developed by the other party at its time, skill and expense, are valuable assets of the other party, and are confidential and proprietary in nature . . . ." (Dep. Exh. 396, ¶ 2.) Therefore, it is apparent that any benefits Plaintiff conferred upon Defendant were not rendered with an expectation of payment, but rather were transferred pursuant to the Mutual Nondisclosure Agreement.

Plaintiff and Defendant conducted consensual due diligence to evaluate the potential benefits to each company of a possible business collaboration. Each arguably benefitted, or was "enriched," in some fashion from such information in that it gained knowledge needed for deciding whether to proceed to an agreement. Because this information was not exchanged with an expectation of payment, any enrichment Defendant may have derived from the information is not *per se* unjust. The intention of the parties expressed by the Mutual Nondisclosure Agreement is clear, and the Court therefore cannot, as a matter of law, impose a promise to the contrary. Thus, Plaintiff cannot establish a genuine issue of material fact as to the third element necessary for a claim of unjust enrichment, that is, whether or not a benefit was given gratuitously.

The Court therefore concludes that no genuine issue of material fact exists as to Plaintiff's claim for unjust enrichment. For this reason, Defendant's Motion for Summary Judgment will be GRANTED as to this claim.

6. Remaining Claims—Actual Fraud; Negligent Misrepresentation; Unfair and Deceptive Trade Practices and/or Unfair Competition

i. Count II—Actual Fraud

Plaintiff alleges Defendant committed fraud in which it "sought, *inter alia*, to (1) obtain confidential and proprietary information from VMI to assist in the development of a 3D ultrasound machine; (2) have a transaction with VMI as an 'insurance policy' in case the transaction with Agilent fell through; and (3) eliminate VMI as a competitor · in the event ATL acquired VMI's competitor, Agilent." (Compl., ¶ 64.) In support of this claim Plaintiff states that "Defendant ATL knowingly, and with intent to defraud, made misrepresentations and omissions of material facts . . ." and then alleges 10 specific misrepresentations or omissions made by ATL employees on various dates from June 16, 2000 to November 9, 2000. (*Id.* ¶¶ 62a–62j.) Plaintiff also alleges generally that "[b]etween the spring of 2000 and November 17, 2001[sic], ATL fraudulently omitted to inform VMI about ATL's negotiations and transactions with Agilent despite a duty to do so." (*Id.* ¶ 62k.) Plaintiff additionally charges that "[t]hese misrepresentations and/or omissions were false and misleading at the time they were made" and that Defendant made them "with knowledge of their falsity or recklessly without regard for their truthfulness, with the intent to deceive VMI, and with the intent to induce VMI to act . . ." and that "VMI was, in fact, deceived by ATL's misrepresentations and omissions . . ." and "reasonably and justifiably relied [on them] to its detriment . . ." and "was damaged as a direct and proximate result . . . ." (*Id.* ¶¶ 63, 64, 66, 67, 68.)

Defendant argues Plaintiff cannot show the existence of a genuine issue of material as to two elements of a claim for fraud, namely, 1) whether Defendant made definite and specific representations of material past or present facts, and 2) whether those representations were false. (Def's. Mot. for Sum. Judg., at 10.) Defendant asserts that Plaintiff's "alleged bases for the fraud claim are divided into three categories . . . (1) statements as to the future, (2) statements as to the present or past,

and (3) omissions." (*Id.* at 11.) With regard to the first category, Defendant argues that such "promissory representations" cannot support an action for fraud unless "plaintiff demonstrates that the representation was material and the speaker had no intention of complying at the time the statement was made." (*Id.*) As to the second group, Defendant argues simply that there is "no evidence that these or any other material statements ... were indeed 'misrepresentations'—or that they were made with knowledge of their falsity." (*Id.* at 11–12.) Finally, concerning the third category, Defendant argues a claim for fraud requires that there must have existed a fact relating to a material matter, which Defendant had a duty to communicate, where such duty arose from either "a fiduciary relationship between the parties, ... or where a party has partially disclosed the matter to the plaintiff." (*Id.* at 13.) Defendant contends that neither of these bases which give rise to a duty to communicate applies in this case. (*Id.*)

▆▆▆ In North Carolina, "[t]he essential elements of the tort of fraud are as follows: (1) material misrepresentation of a past or existing fact; (2) the representation must be definite and specific; (3) made with knowledge of its falsity or in culpable ignorance of its truth; (4) that the misrepresentation was made with intention that it should be acted upon; (5) that the recipient of the misrepresentation reasonably relied upon it and acted upon it; and (6) that [thereby] resulted in damage to the injured party." *Horack,* 150 N.C.App. at 313, 563 S.E.2d at 53 (quotation omitted) ("thereby" inserted by *Horack* court). As the first element indicates, the misrepresentation must ordinarily be of a past or existing fact. However, when a future representation is made "with an intent to deceive the purchaser and at the time of

making the misrepresentation the defendant has no intention of performing his promise, fraud may be found." *Leake v. Sunbelt Ltd. of Raleigh,* 93 N.C.App. 199, 204–05, 377 S.E.2d 285, 289 (1989) (citing *Johnson v. Phoenix Mut. Life Ins. Co.,* 300 N.C. 247, 266 S.E.2d 610 (1980), *overruled in part on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.,* 323 N.C. 559, 374 S.E.2d 385 (1988)). With regard to omissions and when a duty to disclose may arise, "North Carolina courts acknowledge that once a party speaks, it 'must make a full and fair disclosure as to the matters [it] discusses.'" *Rhone–Poulenc,* 73 F.Supp.2d at 551 (M.D.N.C.1999) (quoting *Ragsdale v. Kennedy,* 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974)).

▆▆▆ With regard to Plaintiff's fraud claim, the Court cannot conclusively determine that "the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." *Campbell,* 21 F.3d at 55 (quotation omitted). There are genuine issues of material fact which are in dispute as to whether the alleged statements of future intent were material and whether the speaker had no intention of complying at the time the statement was made. Genuine issues of material fact also exist as to whether the statements which Plaintiff has alleged of past or present fact were misrepresentations made with knowledge of their falsity, or, in culpable ignorance of the truth. And, finally, although the alleged omissions may not be based on a duty to disclose arising from a fiduciary relationship,[12] Plaintiff has adequately raised a claim that a duty existed requiring further disclosure by Defendant because Defen-

---

12. See discussion, above, finding that no fiduciary relationship existed here.

dant partially disclosed to Plaintiff that it was involved in other negotiations.

Thus, the Court finds Defendant has not met its burden of demonstrating there are no genuine issues as to any material facts with respect to the claim of actual fraud. Defendant is therefore not entitled to judgment as a matter of law on Plaintiff's claim of actual fraud and, accordingly, the Court will DENY Defendant's Motion for Summary Judgment as to this claim.

ii. Count III—Negligent Misrepresentation

In support of its claim of negligent misrepresentation Plaintiff alleges, "[i]f the ATL false statements or omissions set forth [in support of the actual fraud claim] were not made with knowledge or recklessness as to their falsity, then they were made negligently, or without due care, by ATL." (Compl., ¶ 70.) To satisfy the elements of the claim, Plaintiff alleges Defendant "supplied this information to VMI ... and failed to exercise [the level of] care and competence in obtaining and communicating the information which VMI was justified in expecting" and "VMI is the entity for whose guidance the information was supplied and ATL knew that VMI would reasonably rely on ATL's representations, and intended to influence VMI through those representations." (*Id.* ¶¶ 71, 72.) Plaintiff has also alleged that "VMI was, in fact, deceived ... and reasonably and justifiably relied to its detriment on these misrepresentations ..." and "VMI was

damaged as a direct and proximate result ...." (*Id.* ¶¶ 73, 74.)

■■■ Defendant's arguments against this claim are similar to those it advanced as to Plaintiff's actual fraud claim. It contends that Plaintiff cannot establish "that the alleged statements were of false past or present fact, and it further cannot establish reasonable reliance." (Def.'s Mot. for Sum. Judg., at 15.) As with its arguments against actual fraud, Defendant levels three challenges against the categories of misrepresentations and omissions Plaintiff has alleged: "[f]irst ... VMI cannot utilize the alleged statements of future intent to support a negligent misrepresentation claim," second, Plaintiff "has not demonstrated a genuine issue of material fact as to [the alleged misrepresentations'] falsity" and, finally, Defendant argues Plaintiff cannot base the claim on omissions because "the tort of negligent omission does not presently exist in North Carolina."[13] (Def.'s Mot. for Sum. Judg., at 15–16.)

■■■ As this Court has stated, "[u]nder the North Carolina, as well as the majority rule, the tort of negligent misrepresentation 'occurs when in the course of a business or other transaction in which an individual has a pecuniary interest, he or she supplies false information for the guidance of others in a business transaction without exercising reasonable care in obtaining or communicating the information.'" *Rhodes, Inc. v. Morrow*, 937 F.Supp. 1202,

---

**13.** Defendant is correct that, under North Carolina law, omissions cannot form the basis for the tort of negligent misrepresentation. *Breeden v. Richmond Comm. Coll.*, 171 F.R.D. 189, 202–03 (M.D.N.C.1997) (stating that the court could find no North Carolina caselaw extending the tort of negligent misrepresentation to cover "negligent omissions," and that other states have rejected claims of "negligent omissions" as well, then finding that "the tort of negligent omission does not presently exist in North Carolina.") (citations omitted). Plaintiff seems to recognize that such is the case and clarifies its allegations by stating "VMI has not alleged negligent omission but rather a series of affirmative misrepresentations of material fact." (Pl.'s Opp'n, at 13.) Accordingly, the Court will not address either party's arguments directed to the question of whether there was or was not a negligent omission.

1215 (M.D.N.C.1996) (quoting *Fulton v. Vickery,* 73 N.C.App. 382, 388, 326 S.E.2d 354, 358 (1985), *rev. denied* 313 N.C. 599, 332 S.E.2d 178 (1985)). The elements of the claim follow the Restatement of Torts § 552 which states that the tort occurs when: " 'a) [a party] fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and (b) the harm is suffered (i) by the person or one of the class of persons for whose guidance the information was supplied, and (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.' " *Davidson and Jones, Inc. v. County of New Hanover,* 41 N.C.App. 661, 669, 255 S.E.2d 580, 585 (1979) (quoting Restatement of Torts, § 552 (1938)). "[T]he false representation *generally* cannot be to a future occurrence because the determination of truth or falsity must be made at the time of the representation." *Id.* (citing *Childress v. Nordman,* 238 N.C. 708, 78 S.E.2d 757 (1953)) (emphasis supplied). This requirement is applicable in most circumstances, except for those "where [the truth or falsity of a representation] may be regarded as continuing in character . . . ." *Childress,* 238 N.C. at 713, 78 S.E.2d at 761.

Plaintiff's allegations in support of this claim are the same as those underlying the fraud claim. As the arguments from each side and controlling caselaw make clear, the elements of the two torts are similar. Therefore, like the fraud claim, the Court finds genuine issues of material fact exist here.

With regard to alleged misrepresentations that may have been as to future occurrences, the Court finds Plaintiff has alleged a series of misrepresentations that were continuing in character. Therefore, these statements can and do form the ba-

sis for the existence of a genuine issue of material fact as to whether the statements were made without exercising reasonable care in obtaining or communicating the information contained within them. As for alleged misrepresentations relating to past or present facts, the Court finds that Plaintiff has also set forth adequate evidence showing that a genuine issue of material fact exists as to whether the alleged statements were false, and whether Plaintiff reasonably relied on them.

Based on the existence of genuine issues of material fact which support this claim, the Court finds Defendant is not entitled to judgment as a matter of law. Accordingly, the Court will DENY Defendant's Motion for Summary Judgment as to Plaintiff's claim for negligent misrepresentation.

iii. Count IV—Unfair and Deceptive Trade Practices and/or Unfair Competition

Plaintiff's final remaining claim is that "ATL's actions constitute unfair or deceptive acts or practices, or an unfair method of competition in violation of the provisions of N.C. Gen.Stat. § 75–1.1 *et seq.*" (Compl., ¶ 76.) In support of this claim Plaintiff alleges that "ATL's actions were immoral, unethical, oppressive, and unscrupulous" and that the "actions were in and affected commerce in North Carolina" and "VMI was damaged as a direct and proximate result . . ." of them. (*Id.* ¶¶ 77, 78, 79.) Additionally, Plaintiff states it is "entitled to recovery from ATL of its damages and losses attributable to such unfair and deceptive acts and practices in treble the amount which may be assessed by the Court and, further, to recovery of its reasonable attorneys' fees pursuant to N.C. Gen.Stat. § 75–16." (*Id.* ¶ 80.)

Defendant asserts that it is entitled to summary judgment on this claim because,

"[a]s a matter of law, the facts upon which VMI's substantive claims are based cannot support a Chapter 75 action." (Def.'s Mot. for Sum. Judg., at 18.) Defendant contends "the alleged acts underlying VMI's fraud claim ... do not support a Chapter 75 action" because the alleged affirmative statements "amount to 'promises of 'future intent' ' " and because any omissions will "not supply a basis for a claim under Section 75–1.1 ...." (*Id.*) As for Plaintiff's underlying allegations of negligent misrepresentation, Defendant argues that this claim as well cannot support a claim under Section 75–1.1, for the same reasons "as those for fraud ...." (*Id.* at 19.) Namely, because "statements of 'future intent' are not actionable ... reliance upon them is not reasonable, ... [and] VMI has not shown that ATL's statements of 'past or present' fact were false," and because " 'negligent omission' is not an action recognized in North Carolina ...." [14] *Id.*

 North Carolina General Statute Section 75–1.1 provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful." N.C. Gen.Stat. § 75–1.1(a) (2002). "In order to prevail under this statute plaintiffs must prove: (1) defendant committed an unfair or deceptive act or practice, (2) that the action in question was in or affecting commerce, (3) that said act proximately caused actual injury to plaintiff." *Canady v. Mann,* 107 N.C.App. 252, 260, 419 S.E.2d 597, 602 (1992). Various fact scenarios and underlying claims may give rise to a claim of unfair trade practices. For example, "[p]roof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts ...." *Hardy v. Toler,* 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975). Likewise, "[a] misrepresentation may constitute an unfair and deceptive trade practice ...," and "deliberate acts of deceit or bad faith need not be shown." *First Atlantic Mgmt. Corp. v. Dunlea Realty Co.,* 131 N.C.App. 242, 254, 507 S.E.2d 56, 64 (1998) (citation omitted). In order for misrepresentation to form the basis for an unfair and deceptive practices claim, "a party's words or conduct must possess the tendency or capacity to mislead or create the likelihood of deception." *Id.* (quotation omitted).

As these holdings demonstrate, evidence that creates a genuine issue of material fact as to claims of fraud or negligent misrepresentation also inherently creates genuine issues of material fact sufficient to present a § 75 claim to a jury.[15] At this stage, based on the evidence offered in support of Plaintiff's underlying claims of fraud and negligent misrepresentation, the

14. In the brief supporting its Motion for Summary Judgment Defendant also argues that Plaintiff's breach of contract and breach of fiduciary duty claims cannot form the basis for a Chapter 75 action. In light of the Court's grant of summary judgment on these two claims, it is unnecessary to address these arguments.

15. Moreover, a particular set of facts may be sufficient to create a genuine issue of material fact as to a § 75 claim, yet not rise to the level of creating a genuine issue as to a claim of fraud. *See Hardy* 288 N.C. at 309, 218 S.E.2d at 346 ("Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts; however, the converse is not always true."). One reason this is so is because fraud requires scienter, while § 75 does not. *See Leake* 93 N.C.App. at 205, 377 S.E.2d at 289 ("[Plaintiffs] need not allege intent in their Chapter 75 claim based on defendants' representations that they would build certain recreational facilities. Intent is irrelevant in a Chapter 75 claim. Plaintiffs need only show that defendants' actions were unfair or deceptive acts or practices in or affecting commerce." (internal citation and quotation omitted)). Therefore, facts that create a genuine issue as to a fraud claim necessarily create a genuine issue as to a § 75 claim as well.

Court is not able to conclusively determine that Plaintiff cannot prevail under any circumstances on its § 75 claim. The Court therefore finds that genuine issues of material fact exist as to whether Defendant's acts constituted a violation of § 75. Consequently, the Court will DENY Defendant's Motion for Summary Judgment as to Plaintiff's claim of Unfair and Deceptive Trade Practices and/or Unfair Competition.

## IV. CONCLUSION

For the previously stated reasons, Defendant's Motion to Strike portions of declarations filed by Plaintiff accompanying its memorandum in opposition to Defendant's Motion for Summary Judgment [Document # 57] is DENIED in full. Defendant's Motion to Strike Plaintiff's Statement of Specific Facts [Document # 58] is GRANTED in full and the entire document is hereby STRICKEN from the record. Furthermore, for the previously stated reasons, Defendant's Motion for Summary Judgment [Document # 47] is GRANTED IN PART such that Plaintiff's claims for breach of fiduciary duty, breach of contract, breach of joint venture agreement, constructive fraud, and unjust enrichment are hereby DISMISSED. Defendant's Motion for Summary Judgment [Document # 47] is DENIED IN PART such that Plaintiff's claims for actual fraud, negligent misrepresentation, and unfair and deceptive trade practices and/or unfair competition remain and may proceed to trial by jury.