DeGorter v. Capitol Wealth, Inc., 2016 NCBC 42.

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

DAVID J. DeGORTER,

        Plaintiff,

    v.

CAPITOL WEALTH, INC. d/b/a/ CAPITOL
WEALTH ADVISORS, and CAPITOL
NATIONAL BANK, N.A.,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
10 CVS 20825

**ORDER AND OPINION ON
DEFENDANT CAPITOL
WEALTH'S MOTION FOR
SUMMARY JUDGMENT**

{1} **THIS MATTER** is before the Court upon Defendant Capitol Wealth, Inc. d/b/a Capitol Wealth Advisors' ("Capitol Wealth") Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure (the "Motion") in the above-captioned case. After considering the Motion, the briefs in support of and in opposition to the Motion, and the appropriate evidence of record, the Court **GRANTS** the Motion and **DISMISSES** Plaintiff David J. deGorter's ("deGorter") claims with prejudice.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jeffery E. Oleynik, Clint S. Morse, and Benjamin R. Norman, and Jennifer K. Van Zant, for Plaintiff David J. deGorter.*

> *Smith Moore Leatherwood LLP, by Neale T. Johnson, Jonathan P. Heyl, and William R. Forstner, for Defendant Capitol Wealth, Inc. d/b/a Capitol Wealth Advisors.*

Bledsoe, Judge.

I.

INTRODUCTION AND PROCEDURAL HISTORY

{2} This Motion is ripe for decision after a lengthy procedural history. DeGorter initiated this lawsuit in 2010, originally asserting claims for (i) breach of fiduciary duty against Capitol Bancorp Ltd. ("Capitol Bancorp") and Capitol Wealth; (ii) constructive fraud against Capitol Bancorp, Capitol Wealth, and Capitol National Bank, N.A. ("Capitol National" and, collectively with Capitol Bancorp and Capitol

Wealth, the "Capitol Defendants"); (iii) negligent misrepresentation against all three Capitol Defendants; and (iv) unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1.1 also against all three Capitol Defendants. This Court (Murphy, J.) granted the Capitol Defendants' Motion to Dismiss deGorter's section 75-1.1 claim on July 29, 2011, leaving deGorter's claims for breach of fiduciary duty, constructive fraud, and negligent misrepresentation to proceed to discovery.

{3}     On January 19, 2012, the Capitol Defendants moved for summary judgment on deGorter's remaining claims, and Capitol National moved for summary judgment on its counterclaim against deGorter.

{4}     On August 9, 2012, before the Court ruled on the Capitol Defendants' motion, Capitol Bancorp filed a Chapter 11 petition in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Case"). As a result, all further proceedings in this case against Capitol Bancorp were stayed pursuant to the automatic stay in bankruptcy under 11 U.S.C. § 362.

{5}     On October 15, 2012, deGorter filed Proof of Claim No. 731 in the Bankruptcy Case in the amount of $1.5 million (the "Proof of Claim"), attaching the Complaint in this case as evidence of Capitol Bancorp's alleged indebtedness. On January 24, 2013, the Bankruptcy Court granted relief from the automatic stay to allow deGorter to liquidate his Proof of Claim in this action.

{6}     On January 17, 2014, the Bankruptcy Court confirmed Capitol Bancorp's Chapter 11 Plan (the "Plan") and, pursuant to the Plan, appointed a liquidating trustee over all of Capitol Bancorp's assets. The Plan enjoined all creditors, including deGorter, from pursuing any claims against Capitol Bancorp; thus, under the terms of the confirmed Plan, deGorter could not proceed against Capitol Bancorp in this Court, even though he had previously been granted relief from the automatic stay. The Plan also established a deadline of July 31, 2014 for creditors and any party in interest to object to deGorter's Proof of Claim.

{7}     On June 26, 2014, the Court (Murphy, J.) ruled, in part, on the Capitol Defendants' outstanding motion for summary judgment. Judge Murphy granted summary judgment in favor of Capitol National on deGorter's claims against Capitol

National, dismissing those claims with prejudice, and entered judgment on Capitol National's counterclaim against deGorter. Judge Murphy withheld ruling, however, on deGorter's claims against Capitol Bancorp and Capitol Wealth pending final disposition of the Bankruptcy Case.

{8}    Neither the liquidating trustee in the Bankruptcy Case, nor any of the Capitol Defendants, filed an objection to deGorter's Proof of Claim by the July 31, 2014 deadline for objections.

{9}    On November 9, 2015, Capitol Bancorp filed a motion in the Bankruptcy Case to enforce the Plan injunction, requesting the Bankruptcy Court to enter an order requiring deGorter to dismiss his claims against Capitol Bancorp in this case and allowing his claims against Capitol Wealth to proceed before this Court. On November 16, 2015, deGorter filed a motion for declaration of approved claim and a request for relief from the post-confirmation injunction in the Bankruptcy Case, requesting the Bankruptcy Court to enter an order deeming his Proof of Claim as allowed in the Bankruptcy Case and permitting deGorter to proceed against Capitol Wealth in this current action.

{10}    The matter came on for hearing before the Bankruptcy Court on December 15, 2015. At the hearing, the parties announced their agreement to a consent order. The consent order, which was entered by the Bankruptcy Court on December 18, 2015 (the "Consent Order"), ordered that: (1) "Proof of Claim No. 731 for $1.5 million is hereby allowed"; (2) "deGorter shall dismiss his claims against [Capitol Bancorp] in [the Business Court action]"; (3) "[t]he assets of Capitol Wealth, Inc. are hereby abandoned by the above bankruptcy estate"; and (4) Capitol Wealth is not covered by the post-confirmation injunction contained in the confirmed plan." (Capitol Wealth's Suppl. Br. Ex. D.)

{11}    Thereafter, on December 22, 2015, this Court held a telephonic status conference to discuss a plan for proceeding with adjudication of the present Motion as brought by Capitol Wealth. As discussed at the December 22 status conference, deGorter filed his Notice of Intent to Raise Res Judicata in connection with Capitol Wealth's Motion on January 15, 2016, and the Court permitted the parties to brief

the issue. DeGorter dismissed his claims against Capitol Bancorp on January 25, 2016.

{12} All briefing on the Motion has been completed. The Court held a hearing on the Motion on March 1, 2016, and the Motion is now ripe for resolution.

II.

FACTUAL BACKGROUND

{13} The Court does not make findings of fact on motions for summary judgment under Rule 56. *See Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975). Rather, the Court summarizes facts, noting both the facts that it believes are undisputed and others that it believes are contested, in order to provide context for the claims and the motion. *Id.* In ruling on a motion under Rule 56, "the trial court must view all evidence in the light most favorable to the non-movant, accepting the latter's asserted facts as true, and drawing all reasonable inferences in its favor." *Anderson v. Demolition Dynamics, Inc.*, 136 N.C. App. 603, 605, 525 S.E.2d 471, 472 (2000).

{14} DeGorter is the sole and managing member of deGorter Capital Partners, LLC ("DCP"), an investment firm in the business of providing and securing funding for start-up or purchased businesses. Capitol Wealth is in the business of selling wealth management services and products and is owned, in part, by Capitol Bancorp.

{15} In August 2007, through a business contact at Forethought Financial Group, Inc. ("FFG"), deGorter learned that FFG was seeking a buyer for Forethought Federal Savings Bank ("FFSB"), a national trust savings bank that FFG owned. (Hogan Dep. 19:7–19:25.) DeGorter contacted his friend and business associate, Bob Hogan ("Hogan"), who was President and CEO of Capitol Wealth at the time, about the possibility of a Capitol Bancorp entity acquiring FFSB (the "Proposed Forethought Acquisition"). (Hogan Dep. 22:3–22:6.)

{16} On November 19, 2007, Capitol Bancorp and Capitol Wealth entered into a Letter of Intent with FFG and FFSB relating to the Proposed Forethought Acquisition (the "First LOI"). (Defs.' Dep. Ex. 126.) The transaction was to be structured such that Capitol Bancorp, Capitol Wealth, FFG, and certain other

shareholders of FFSB would form a new corporation, which would then acquire and control FFSB. (Defs.' Dep. Ex. 126.) Neither deGorter nor DCP was a party to the First LOI. The closing of the Proposed Forethought Acquisition was subject to several conditions, including the parties' obtaining all regulatory approvals required to consummate the deal. (Defs.' Dep. Ex. 126.)

{17} On December 18, 2007, Capitol Bancorp and Capitol Wealth executed a second Letter of Intent with FFG and FFSB; this time DCP was also a party (the "Second LOI"). The Second LOI set forth conditions whereby DCP would contribute cash to the proposed new corporation and receive in exchange shares of the proposed new corporation. (Defs.' Dep. Ex. 127.) As with the First LOI, the Second LOI conditioned the consummation of the Proposed Forethought Acquisition on, among other things, obtaining all necessary regulatory approvals. (Defs.' Dep. Ex. 127.)

{18} Over the next couple of months, the parties further negotiated the structure and terms of the Proposed Forethought Acquisition, and deGorter reviewed financial, legal, and structural information regarding the deal and Capitol Bancorp. (DeGorter Dep. 32:23–37:3.)

{19} On March 18, 2008, Capitol Wealth, DCP, FFSB, and FFG executed a Contribution Agreement that set forth the material terms of the Proposed Forethought Acquisition (the "Contribution Agreement"). Although Capitol Bancorp was not originally a party to the Contribution Agreement, the parties executed an Assignment and Assumption Agreement in May 2008 whereby Capitol Bancorp received all of Capitol Wealth's rights, interests, obligations, and liabilities under the Contribution Agreement.

{20} Pursuant to the Contribution Agreement, DCP was to invest approximately $2 million in exchange for a 24.6 percent interest in the new corporation. (Defs.' Br. Supp. Mot. Summ. J. Ex. A., hereafter "Contr. Agmt.", § 2.3.) DeGorter, acting on behalf of DCP, submitted an application to the federal Office of Thrift Supervision for DCP's proposed acquisition of shares in the new entity. (DeGorter Dep. 50:11–50:17; Defs.' Dep. Ex. 129.) Capitol Bancorp also submitted an application to its regulators. (DeGorter Dep. 53:8–53:10.) According to deGorter, regulatory approval was the final

step needed before the Proposed Forethought Acquisition could be consummated. (DeGorter Dep. 41:19–42:3.)

{21} On June 2, 2008, Capitol Bancorp responded to a Federal Reserve request for information relating to the Proposed Forethought Acquisition and other proposed investments. In this letter, Capitol Bancorp indicated that it had decided, in December 2007, to suspend future development activity for the time being, but would complete planned transactions, including the Proposed Forethought Acquisition. (Pl.'s Br. Opp. Mot. Summ. J. Ex. 7.) Later that month, Capitol Bancorp withdrew its application to the Federal Reserve, although, on June 19, Hogan advised FFG that Capitol Bancorp continued to be committed to the Proposed Forethought Acquisition.

{22} DeGorter contends that in late June 2008, while regulatory approvals were still pending, he learned from Hogan that federal regulators would approve the Proposed Forethought Acquisition only if Capitol Bancorp successfully raised additional capital through a securities offering (the "Securities Offering"). (DeGorter Dep. 56:5–58:2.) DeGorter further alleges that Hogan told him that the Securities Offering was undersubscribed and asked him to purchase shares in the Securities Offering ("Trust Preferred Securities" or "Securities") to help Capitol Bancorp obtain the requisite regulatory approval for the Proposed Forethought Acquisition. (DeGorter Dep. 56:5–58:14.) According to deGorter, Hogan offered, on behalf of Capitol Bancorp, to finance the full purchase price of deGorter's purchase of Securities, (deGorter Dep. 87:23–88:5), and to "buy them back" after the Proposed Forethought Acquisition was completed, (deGorter Dep. 95:2–95:20).

{23} During these discussions, Hogan provided deGorter a copy of the preliminary prospectus for the offering of Trust Preferred Securities (the "Prospectus"), which deGorter acknowledged that he reviewed. (DeGorter Dep. 58:15–58:23.) The Prospectus included multiple warnings and risk factors, including that loan loss allowances may prove inadequate to absorb actual losses, reliance on commercial real estate for collateral could cause substantial credit losses, loan origination activities involved collateral evaluations risks, there existed the possibility of an additional need for capital raising, and federal regulatory activities

could impact or limit operations. (Defs. Dep. Ex. 134 S-13–S-22.) Moreover, Capitol Bancorp limited the guarantees associated with the Securities by only guaranteeing distributions or redemptions under certain circumstances. (Defs.' Dep. Ex. 134 S-20.) Capitol Bancorp further disclosed that deferral of interest payments could affect the market price of the Securities. (Defs.' Dep. Ex. 134 S-21.)

{24}   The Prospectus also stated that "[t]here can be no assurance as to the market prices for the Trust Preferred Securities . . . ; therefore, the holders of the Trust Preferred Securities may suffer a loss." Further, the Prospectus warned that the secondary market could be illiquid, and that there was no guarantee that a purchaser would be able to sell the Securities at the price originally paid for them. (Defs.' Dep. Ex. 134 S-22.)

{25}   In addition to reviewing the Prospectus, deGorter discussed the Securities Offering with his personal investment advisor. (Defs.' Br. Supp. Mot. Summ. J. Ex. B.)

{26}   On July 8, 2008, deGorter purchased 150,000 shares of Trust Preferred Securities for a total investment of $1.5 million. (DeGorter Dep. 87:20–87:22; Defs.' Dep. Ex. 135.) DeGorter used existing funds in his brokerage account to purchase the Securities. (DeGorter Dep. 92:8–92:14.)

{27}   The week before, on July 2, 2008, Capitol National had approved two separate lines of credit for deGorter: (i) a $1,050,000 line of credit to be secured by deGorter's 150,000 shares of Trust Preferred Securities, and (ii) a $450,000 unsecured line of credit. (Defs.' Dep. Ex. 141.) The loan documents were signed by deGorter and dated July 3, 2008. (Defs.' Dep. Exs. 142, 144.) It is undisputed, however, that deGorter did not draw on either line of credit until September 5, 2008, two months after his purchase of Securities. (Defs.' Dep. Ex. 148.) At the time deGorter drew on the lines of credit, the Proposed Forethought Acquisition had not been finalized, and deGorter had no obligation to contribute any capital to the Proposed Forethought Acquisition. (DeGorter Dep. 134:7–134:11.)

{28}   Ultimately, federal regulators did not approve the Proposed Forethought Acquisition.

{29} Under the terms of the loan agreements, each line of credit was to mature on July 3, 2009. (Defs.' Dep. Exs. 142, 144.) It is undisputed that deGorter renewed each line of credit, and, at the time deGorter renewed the lines of credit, the Proposed Forethought Acquisition had been terminated, (deGorter Dep. 80:17–80:24), and deGorter had not asked Capitol Bancorp to buy back his Securities, (deGorter Dep. 97:7–97:19).

{30} FFG formally terminated the Second LOI on January 9, 2009. DeGorter did not ask Capitol Bancorp to "buy back" his Trust Preferred Securities at the time the transaction was terminated and only first inquired about a possible buy back of his now substantially devalued Securities in late 2009 or early 2010.

{31} Under the terms of the renewals for each loan, the $1,050,000 line of credit matured on April 3, 2010, and the $450,000 line of credit matured on January 3, 2010. (Defs.' Dep. Exs. 134, 155.) DeGorter eventually fully satisfied the $450,000 obligation to Capitol National; he never repaid the $1,050,000 loan.

III.

LEGAL STANDARD

{32} Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). The moving party has "the burden of showing there is no triable issue of material fact." *Farrelly v. Hamilton Square*, 199 N.C. App 541, 543, 459 S.E.2d 23, 25–26 (1995). The movant may meet this burden "by showing either that: (1) an essential element of the non-movant's case is nonexistent; or (2) based upon discovery, the non-movant cannot produce evidence to support an essential element of its claim; or (3) the movant cannot surmount an affirmative defense which would bar the claim." *McKinnon v. CV Indus.*, 213 N.C. App. 328, 332, 713 S.E.2d 495, 499 (2011) (citation omitted.) In determining whether this burden has been met, the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Whitley v. Cubberly*, 24 N.C. App. 204, 206–07, 210 S.E.2d 289, 291

(1974).  Our Supreme Court has observed that "summary judgment is particularly inappropriate where issues such as motive, intent, and other subjective feelings and reactions are material and where the evidence is subject to conflicting interpretations." *Creech v. Melnik*, 347 N.C. 520, 530, 495 S.E.2d 907, 913 (1998); *see generally McKee v. James*, 2014 NCBC LEXIS 74, at *13–14 (N.C. Super. Ct. Dec. 31, 2014) (discussing standard).

IV.

ANALYSIS

A.     Issue Preclusion

{33}   The Court first addresses deGorter's argument, raised in supplemental briefing, that the Bankruptcy Court's Consent Order allowing deGorter's Proof of Claim against Capitol Bancorp bars Capitol Wealth from re-litigating issues that were decided by the Bankruptcy Court.

{34}   Issue preclusion, or collateral estoppel, bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (internal quotation marks and citation omitted).[1]   The party invoking issue preclusion must, under federal common law, establish the following elements:

> (1) the issue to be precluded is identical to the issue already litigated, (2) the issue was actually determined in the prior proceeding, (3) the determination of the issue was an essential part of the decision in the prior proceeding, (4) the prior judgment was final and valid, and (5) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue.

*Coleman v. Cmty. Trust Bank (In re Coleman)*, 426 F.3d 719, 729 (4th Cir. 2005).

{35}   DeGorter has not met his burden to establish that the Proof of Claim was "actually litigated" in the Bankruptcy Case.  "In the case of a judgment entered by

---

[1] Federal common law determines the preclusive effect of prior federal bankruptcy court orders in North Carolina state court proceedings. *See United States ex rel. May v. Purdue Pharma L.P.*, 737 F.3d 908, 912 (4th Cir. 2013) ("The preclusive effect of a judgment issued by a federal court is a legal question governed by federal common law[.]").

confession, consent, or default, none of the issues is actually litigated." *Arizona v. California*, 530 U.S. 392, 414 (2000) (quoting Restatement (Second) of Judgments § 27 cmt. e (1982)). Indeed, "consent agreements ordinarily are intended to preclude any further litigation on the claim presented but are *not* intended to preclude further litigation on any of the issues presented." *Id.* (emphasis added) (quoting 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4443 (1981)). The reason for such a rule is that "a party may choose not to litigate issues for reasons that have nothing to do with the merits of the case." *In re O'Quinn*, 401 B.R. 739, 743 (Bankr. M.D.N.C. 2009). Here, the Consent Order entered by the Bankruptcy Court was stipulated to by both deGorter and Capitol Wealth and contemplated continuation of the action against Capitol Wealth in this Court. Accordingly, the Court concludes that Capitol Wealth's liability in this action was not "actually litigated" in the Bankruptcy Court and thus that collateral estoppel does not apply to bar Capitol Wealth's defense.

### B.     Breach of Fiduciary Duty and Constructive Fraud

{36}     DeGorter's claims for breach of fiduciary duty and constructive fraud both require the existence of a fiduciary duty. *See, e.g.*, *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) ("For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties."); *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 28, 560 S.E.2d 817, 823 (2002) (stating that to prove a constructive fraud claim, "a plaintiff must show (1) the existence of a fiduciary duty"). A fiduciary duty arises when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Curl v. Key*, 311 N.C. 259, 264, 316 S.E.2d 272, 275 (1984) (citation omitted).

{37}     DeGorter argues that Capitol Wealth owed fiduciary duties to deGorter because the execution of the Contribution Agreement allegedly created a joint venture between them. Capitol Wealth contends in opposition that no fiduciary duty runs from Capitol Wealth to deGorter because (i) deGorter was not one of the alleged joint venturers, (ii) the Contribution Agreement created no fiduciary duty, and (iii) in

any event, no joint venture was ever consummated because the transaction contemplated by the Contribution Agreement never closed.

{38}   DeGorter's breach of fiduciary duty and constructive fraud claims hinge on his claim that a joint venture existed between deGorter and Capitol Wealth arising out of the Contribution Agreement. DeGorter, however, did not enter the Contribution Agreement in his individual capacity, but rather on behalf of DCP. Given that deGorter has not offered any evidence suggesting that DCP's corporate form should be disregarded for any reason, to the extent that Capitol Wealth owed any duties under the Contribution Agreement, those duties were owed to DCP, not to deGorter individually, and deGorter's fiduciary duty-based claims should be dismissed as a result. *See Silverman v. Miller*, 155 B.R. 362, 375 (Bankr. E.D.N.C. 1993) (applying North Carolina law and holding that individuals who are not actual partners in a partnership do not owe fiduciary duties based on their agreement to enter into a partnership in the future).

{39}   Moreover, our Court of Appeals has explained that:

> the essential elements of a joint venture are (1) an agreement to engage in a single business venture with the joint sharing of profits, *Edwards v. Bank*, 39 N.C. App. 261, 275, 250 S.E.2d 651, 661 (1979), (2) with each party to the joint venture having a right in some measure to direct the conduct of the other "*through a necessary fiduciary relationship.*" *Cheape v. Town of Chapel Hill*, 320 N.C. 549, 562, 359 S.E.2d 792, 799 (1987) (emphasis in original). The second element requires that the parties to the agreement stand in the relation of principal, as well as agent, as to one another. *Id.* at 562, 359 S.E.2d 799–800.

*Se. Shelter Corp. v. Btu, Inc.*, 154 N.C. App. 321, 327, 572 S.E.2d 200, 204–05 (2002).

{40}   Although in his effort to satisfy the second element deGorter argues in conclusory fashion that "each party [to the Contribution Agreement] ha[d] a right in some measure to direct the conduct of the other," (Pl.'s Br. Opp. Mot. Summ. J. 16), deGorter has not brought forward any evidence showing that he and Capitol Wealth stood in the relation of principal and agent to one another at any time. As a result, because deGorter has failed to offer evidence on the second element necessary to create a joint venture, the Court concludes that a joint venture was never formed

between deGorter and Capitol Wealth as a matter of North Carolina law, providing a further basis for dismissal of deGorter's breach of fiduciary duty and constructive fraud claims. *Se. Shelter Corp.*, 154 N.C. App. at 327, 572 S.E.2d at 204–05 (dismissing breach of fiduciary duty claim where plaintiff failed to show agency relationship, and hence a joint venture, between plaintiff and defendant); *see also Cheape*, 320 N.C. at 562, 359 S.E.2d at 299 (finding joint venture did not exist because plaintiff failed to show agency relationship).

{41} Last, it is undisputed that the transactions contemplated by the Contribution Agreement did not occur because the required regulatory approvals were never obtained. As a result, by the Contribution Agreement's own express terms, the parties' obligations to each other under the Agreement never became effective. (Contr. Agmt. § 9.1) ("[t]he respective obligations of each Party under this Agreement shall be subject to the fulfillment at or prior to the Closing Date of . . . all Regulatory Approvals"). Accordingly, even if the Contribution Agreement somehow could be read to create a joint venture between Capitol Wealth and non-party deGorter, that joint venture never came to fruition. Again, deGorter's lack of evidence of a joint venture is fatal to his breach of fiduciary duty and constructive fraud claims. *See, e.g.*, *Crockett Capital Corp. v. Inland Am. Winston Hotels, Inc.*, 2011 NCBC LEXIS 7, at *59–61 (N.C. Super. Ct. Feb. 28, 2011) (dismissing constructive fraud claim for failure to show fiduciary duty where implementing documents required to form joint venture under parties' agreement were never executed).

{42} The fact that it was represented in two industry publications that Capitol Wealth and Capitol Bancorp described the proposed transaction as a "joint venture" does not alter the Court's analysis. Indeed, both publications identified DCP, not deGorter individually, as the contracting party with Capitol Bancorp, and neither article suggests in any way that Capitol Wealth and deGorter were in an agency relationship with one another at any time.

{43} Accordingly, for the reasons set forth above, the Court concludes that deGorter's claims for breach of fiduciary duty and constructive fraud should be dismissed with prejudice.

C.    Negligent Misrepresentation

{44}    A claim for negligent misrepresentation is stated as follows:

> One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon information if
>
> (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and
>
> (b) the harm is suffered
>
>> (i) by the person or one of the class of persons for whose guidance the information was supplied, and
>>
>> (ii) because of his *justifiable reliance* upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.

*Helms v. Holland*, 124 N.C. App. 629, 635, 478 S.E.2d 513, 517 (1996) (citing *Powell v. Wold*, 88 N.C. App. 61, 67, 362 S.E.2d 796, 799 (1987)).  In sum, "the action lies where pecuniary loss results from the supplying of false information to others for the purpose of guiding them in their business transactions." *Howard v. Cnty. of Durham*, 227 N.C. App. 46, 55, 748 S.E.2d 1, 7 (2013) (citation omitted).

{45}    DeGorter relies on three alleged misrepresentations to support his claim against Capitol Wealth: (i) that a "successful Trust Preferred Securities offering was required—and sufficient—for Federal Reserve approval of the [Proposed Forethought Acquisition]," (Compl. ¶ 82); (ii) that "if Mr. deGorter just wanted [to] own the Trust Preferred Securities for a short while, [Capitol Bancorp] would buy the shares back from Mr. deGorter after the [Proposed Forethought Acquisition] was completed," (Compl. ¶ 32); and (iii) that Capitol Bancorp was a viable, strong entity.  (*See, e.g.*, deGorter Dep. 68:17–69:16.)

{46}    Capitol Wealth first contends that deGorter's reliance on each alleged misrepresentation was unreasonable as a matter of law because he had access to the Prospectus and failed to conduct his own reasonable due diligence.  The Court agrees in these circumstances.

{47}  "[R]easonable reliance is . . . a required element of negligent misrepresentation." *L'Heureux Enters. v. Port City Java, Inc.*, 2009 NCBC LEXIS 26, at *15 (N.C. Super. Ct. Sep. 4, 2009) (citing *MacFadden v. Louf*, 182 N.C. App. 745, 749, 643 S.E.2d 432 (2007)). "Reliance is reasonable if the plaintiff has made an independent investigation . . . . Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate[.]" *Id.* at *12 (citing *Calloway v. Wyatt*, 246 N.C. 129, 97 S.E.2d 881 (1957)). "The reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Id.* (citing *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 513 S.E.2d 320 (1999) and *State Props., LLC v. Ray*, 155 N.C. App. 65, 73, 574 S.E.2d 180 (2002)) (concluding that plaintiff's reliance on alleged misrepresentations was unreasonable as a matter of law); *see also Angell v. Kelly*, No. 1:01CV00435, 2006 U.S. Dist. LEXIS 87567, at *27 n.7 (M.D.N.C. Nov. 30, 2006) (applying North Carolina law and holding that "[r]easonableness is usually a jury question, except when 'the facts are so clear that they support only one conclusion,' which is usually the case when a 'plaintiff fails to make any independent investigation'") (quoting *State Props.*, 155 N.C. App. at 73, 574 S.E.2d at 186).

{48}  It is undisputed that Capitol Wealth provided the Prospectus to deGorter in connection with the Securities Offering.  It is also undisputed that deGorter reviewed the Prospectus prior to purchasing the Securities.  (DeGorter Dep. 58:18–58:23.)  The Prospectus did not contain any provision suggesting that the successful placement of the Securities Offering was a requirement for Federal Reserve approval of the Proposed Forethought Acquisition or that Capitol Bancorp would buy back deGorter's Securities at any time or at any specific price.

{49}  Moreover, the Prospectus contained plain warnings that deGorter "should rely only on the information contained in or incorporated by reference in this [Prospectus]," that "[n]o one is authorized to give information other than that contained in this [Prospectus]," and that "[i]f anyone provides you with different or inconsistent information, you should not rely on it."  (Defs.' Dep. Ex. 134.)  The

Prospectus also identified specific risk factors, including that "[d]eferral of interest payments could adversely affect the market price of the [Securities]," "[c]laims would be limited upon bankruptcy, insolvency or receivership," "[t]here can be no assurance as to the market prices for the [Securities] . . . ; therefore, the holders of the [Securities] may suffer a loss," and "[t]he secondary market for the [Securities] may be illiquid." (Defs.' Dep. Ex. 134.)

{50} Numerous Business Court decisions have found a plaintiff's purported reliance to be unreasonable as a matter of law in similar circumstances. *See, e.g.*, *L'Heureux*, 2009 NCBC LEXIS 26, at *13 ("Plaintiffs' reliance on any alleged misrepresentations [contrary to offering and contract documents] . . . as a matter of law was unreasonable."); *JDH Capital, LLC v. Flowers*, 2009 NCBC LEXIS 8, at *32–33 (N.C. Super. Ct. Mar. 13, 2009) (plaintiff's reliance on oral representations contrary to letter of intent the parties executed was unreasonable as a matter of law); *Crockett*, 2011 NCBC LEXIS 7, at *74 (plaintiff's reliance unreasonable as a matter of law where plaintiff failed to inspect documents in its possession that would have cured alleged omission); *Nelson v. Alliance Hospitality Mgmt., LLC*, 2011 NCBC LEXIS 43, at *30–31 (N.C. Super. Ct. Nov. 22, 2011) (expressing doubt at the Rule 12(b)(6) stage that plaintiff could prove reasonable reliance where clear language of disclosed document provided accurate information).

{51} In addition, although deGorter alleges that Hogan represented that a successful Securities Offering was necessary to obtain Federal Reserve approval of the Proposed Forethought Acquisition, he also has acknowledged that Joe Reid, not Hogan, was the executive who directed Capitol Wealth's communications with federal regulators, including the Federal Reserve, (deGorter Dep. 37:2–37:16), and further that he never contacted Reid to confirm or explain Hogan's alleged misrepresentation.

{52} It is also undisputed that none of the loan documents executed by deGorter included any representation that Capitol Bancorp or Capitol Wealth was obligated to buy back the Securities that served as collateral for the loans, (Defs.' Dep. Exs. 142, 143, 144, 154, 155). Similarly, deGorter has offered no evidence that Capitol Wealth

made any representations about the price at which Capitol Bancorp would purportedly "buy back" deGorter's Securities. (DeGorter Dep. 95:14–95:16.)

{53} Finally, as to Capitol Bancorp's financial health, deGorter has offered no evidence that deGorter sought any information about Capitol Bancorp from any source, and Capitol Worth has proffered undisputed evidence from the public record reflecting Capitol Wealth's declining financial performance as of January 2008, information the Court concludes was readily available to deGorter through the exercise of reasonable diligence. Furthermore, deGorter admitted that he had no evidence that Hogan knew of any specific financial trouble at Capitol Bancorp prior to the Securities Offering. (DeGorter Dep. 65:11–65:15.)

{54} Accordingly, based on the above, the Court concludes that deGorter has failed to offer evidence that he reasonably relied on any alleged misrepresentations, and therefore that Capitol Wealth's Motion seeking dismissal of deGorter's claim for negligent misrepresentation should be granted.[2]

V.

CONCLUSION

{55} For the foregoing reasons, the Court hereby **GRANTS** Capitol Wealth's Motion and **DISMISSES** all of deGorter's remaining claims in this action with prejudice.

---

[2] Capitol Wealth also contends that the alleged misrepresentations deGorter relies upon to support his claim are in fact negligent omissions, a basis for a negligent misrepresentation claim not recognized in North Carolina. For clarity, the Court concludes that deGorter's claim for negligent misrepresentation is likewise dismissed with prejudice to the extent the claim is based on negligent omissions. *See, e.g.*, *Bonham v. Wolf Creek Acad.*, 767 F. Supp. 2d 558, 570 (W.D.N.C. 2011) ("[N]egligent *omissions* . . . as opposed to negligent misrepresentations cannot form the basis of a claim for negligent misrepresentation under North Carolina law."); *see also Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc.*, 243 F. Supp. 2d 386, 415 n.13 (M.D.N.C. 2003) ("[U]nder North Carolina law, omissions cannot form the basis for the tort of negligent misrepresentation."). Based on the Court's conclusions concerning deGorter's negligent misrepresentation claim, the Court declines to specifically address Capitol Wealth's additional contention that deGorter's losses in connection with any alleged misrepresentation were proximately caused by his own investment strategy, and not by Capitol Wealth, and thus that his claim is subject to dismissal on this additional, independent basis.

**SO ORDERED**, this the 31st day of May, 2016.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Special Superior Court Judge
 for Complex Business Cases